Filed 7/8/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF AZUSA et al., | C075814 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2013-80001540-CU-WM-GDS) |
| v. | |
| MICHAEL COHEN, as Director, etc., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen H. Sumner, Judge. Affirmed.

Burke, Williams & Sorensen, J. Leah Castella and Matthew D. Visick, for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Marc A. LeForestier, Supervising Deputy Attorney General, S. Michele Inan, Deputy Attorney General, for Defendant and Appellant.

1

This case arises, as have many, from what we have previously characterized as the "Great Dissolution" of California redevelopment agencies. (*City of Pasadena v. Cohen* (2014) 228 Cal.App.4th 1461, 1462-1463 (*Pasadena*).)

The City of Azusa, its municipal utility (Azusa Light and Water, hereafter Utility) and the successor agency to its redevelopment agency (hereafter collectively City except as noted), timely appeal from a judgment denying their amended mandamus petition (Code Civ. Proc, § 1085). The petition sought to compel the director of the Department of Finance (Department) to recognize as enforceable certain obligations between the City and the Utility. These consisted of loans from the Utility to the City's former redevelopment agency (RDA). The City asserts the invalidation of these loans in effect harms the Utility's ratepayers and therefore is unlawful for various reasons. The trial court rejected the City's view, and the City timely appeals from the ensuing judgment.

We agree with the trial court that once Utility money was loaned to the RDA, it ceased to be "ratepayer money." Because the City's legal claims hinge on a contrary view--whether or not explicitly acknowledged in its briefing--each of the City's claims fail.

## BACKGROUND

1. *Redevelopment Agencies Generally*

The Community Redevelopment Law was adopted to address post-World War II urban blight, by allowing the formation of redevelopment agencies to make municipal improvements via "tax increment" funding, which reallocated tax revenues; however, over time concerns grew that abuses were occurring. (See *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245-248 (*Matosantos*); *City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 297-298 (*Emeryville*).)

Amid a fiscal crisis in 2011, the Legislature adopted the dissolution law via statutes "that barred any new redevelopment agency obligations, and established procedures for the windup and dissolution of the obligations of the nearly 400

2

redevelopment agencies then existing." (*Pasadena*, *supra*, 228 Cal.App.4th at pp. 1462-1463; see *Matosantos*, *supra*, 53 Cal.4th at p. 241.)  Our Supreme Court invalidated a portion of the law, but upheld provisions requiring windup and dissolution of redevelopment agencies, as provided by the Health and Safety Code.[1] (*Matosantos*, *supra*, 53 Cal.4th at pp. 274-276.)

The dissolution law provides that successor agencies shall "[e]xpeditiously wind down" the redevelopment agency under "direction of the oversight board." (§ 34177, subd. (h).)  Oversight boards consist of appointed members (§ 34179, subd. (a)), and have a fiduciary duty towards "holders of enforceable obligations and the taxing entities that benefit from distributions of property tax" (§ 34179, subd. (i)), including the duty to review actions by successor agencies, such as "[e]stablishment of the Recognized Obligation Payment Schedule." (§ 34180, subd. (g).)  The recognized obligation payment schedule (ROPS) sets forth remaining "enforceable obligations" as defined (§ 34171, subd. (h)) and allows for review to ensure accuracy.  (See *Emeryville*, *supra*, 233 Cal.App.4th at pp. 298-299.)

2. *The Loans Herein*

There are no relevant factual disputes about the loans at issue, and the trial court prepared a thorough statement of facts from which we borrow liberally.

The City, the Utility, and the RDA, were governed by the same five elected city council members, and at oral argument on the petition the trial court referenced the "three different hats" worn.  Our Supreme Court has noted that "the Legislature could well recognize that because of the conjoined nature of the governing boards of redevelopment agencies and their community sponsors, [obligations between them] often were not the product of arm's-length transactions." (*Matosantos*, *supra*, 53 Cal.4th at p. 258, fn. 12.)

---

[1] All undesignated statutory references are to the Health and Safety Code.

The City is the successor agency to the RDA, bestowing yet another "hat" on city council members. We refer to the City when referencing actions taken by city council members in their capacity as the successor agency.[2]

The Utility provides water and electricity within the City and to some users outside the City. The Utility and City act jointly. The Utility "sets rates and collects money from its ratepayers in an amount sufficient to cover the costs of providing utility services. It is financially self-sufficient, receiving no money from the City general fund or local taxes. The money generated . . . is held in two separate enterprise funds: the Light Fund and the Water Fund." The Utility made six loans to the RDA, "totaling nearly $8 million over the last two decades: four loans from the Light Fund and two loans from the Water Fund. The first loan was made in 1988, and the last in 2011. By 2012, none of the loans had been repaid; the outstanding principal and interest was over $10 million." (Fn. omitted.) "It appears no payments were made on three of the loans," approximately $6,600 was paid on one loan, and "[s]ignificant payments were made on the other two loans . . . although significant amounts remained due."[3]

------

[2] The fact the city council members wear four hats does not *of itself* infer impropriety. "It is presumed that official duty has been regularly performed." (Evid. Code, § 664; see *Emeryville*, *supra*, 233 Cal.App.4th at pp. 302-303.)

[3] The trial court interpreted a local ordinance to permit the Utility to loan money to the City, but implied this did not permit loans to the RDA, and noted this "emphasizes the 'conjoined nature' of the City and the RDA." The City argues it should be accorded deference in interpreting its own ordinances. The Department asserts *all* the loans were unauthorized by the ordinance, and also asserts that the Water Fund loans were unlawful under Proposition 218. Because this action does not seek to invalidate the loans as ultra vires or otherwise, and we resolve it on other grounds, we do not address this dispute. The trial court also addressed a seventh loan, whereby the City loaned sales and use taxes to the RDA in 1988. However, the City has not made any arguments about this seventh loan, abandoning any claims about it. (See *Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 175, fn. 2.)

4

The Department rejected these loans on the City's ROPS, based on section 34171, subdivision (d)(2), providing " 'enforceable obligation' does not include any agreements, contracts, or arrangements between the city . . . that created the redevelopment agency and the former redevelopment agency." The Department found the Utility was the City for purposes of the dissolution law because it is "controlled by" the City. (See § 34167.10, subds. (a)(3); Stats. 2012, ch. 26, § 5.)

The Department issued a "finding of completion," meaning the loans may be repaid if the oversight board finds they were for legitimate redevelopment purposes. (See § 34191.4, subd. (b)(1).) But if that happens, the interest rate would be recalculated, and 20 percent of the loan repayment would be transferred to the "Low and Moderate Income Housing Asset Fund." (See § 34191.4, subd. (b)(2).)

## DISCUSSION

The City heads four multi-faceted claims why it was improper for the Department to refuse to treat the Utility loans as enforceable obligations of the City, acting as the RDA's successor agency: (1) The effect of the Department's actions is to divert special funds for an unlawful purpose; (2) the Department is unlawfully compelling increased taxes; (3) the Department is effecting an unlawful gift of public funds; and (4) the Department's actions will result in unlawful takings.

As we shall explain (part I, *post*), the factual predicate--implicit or explicit--for each of these legal claims is that some assets held by the RDA retained the character of being *ratepayer* assets, because those assets came from the Utility's Light Fund or Water Fund. However, as the trial court found, this factual predicate is incorrect: As money was loaned to the RDA, it became an RDA asset, and therefore was subject to legislative disposition via the dissolution law. We shall then explain (part II, *post*), why each of the City's legal claims falters because of the failure of its factual predicate.

5

# I

## *RDA Assets as Ratepayer Assets*

The City attacks the trial court's central finding that the RDA assets from the loans are not *ratepayer* assets. The City asserts the trial court was wrong, because the loans on the books were liabilities of the RDA, not assets, and the dissolution law could not cancel those liabilities to the detriment of the ratepayers. We disagree.

When the Utility loaned money to the RDA, the RDA took possession of the money, and the Utility received a promise of repayment. But the money was an RDA asset, whether it defaulted on the loan or not. All loans are potentially subject to default.[4] On the effective date of the dissolution law, the RDA was in possession of that money, or whatever objects or interests it had acquired by spending some or all of that money. The dissolution law specifies how all of the assets held by the RDA were to be reallocated, and sets forth detailed definitions of which obligations would and would not be treated as "enforceable" obligations. The dissolution law does not provide for *tracing* RDA assets so as to determine their source.

The "freeze" portion of the dissolution law "is intended to preserve, to the maximum extent possible, the revenues and assets of redevelopment agencies so that those assets and revenues that are not needed to pay for enforceable obligations may be used by local governments to fund core governmental services . . . . All provisions of this

---

[4] We note that each of the five operative promissory notes in the record is captioned as an "unsecured" note, although anticipated payments would come from tax increment revenue and other sources. The other note is not in the record, and although the RDA and City resolutions pertaining to that loan spoke of a "secured" loan, it appears that merely referred to the practice of anticipating RDA loans would be repaid via tax increment revenue. Absent review of the note itself, we do not infer it was a "secured" note in the ordinary sense that specific property or assets guaranteed the loan, nor does the City claim the notes were so secured.

part shall be so construed as broadly as possible to support this intent and to restrict the expenditure of funds to the fullest extent possible." (§ 34167, subd. (a).)

The "dissolution" portion "requires successor agencies to continue to make payments and perform existing [enforceable] obligations. [Citation.] However, unencumbered balances of redevelopment agency funds must be remitted to the county auditor-controller for distribution to cities, the county, special districts, and school districts in proportion to what each agency would have received absent the redevelopment agencies. [Citations.] Proceeds from redevelopment agency asset sales likewise must go to the county auditor-controller for similar distribution. [Citation.] Finally, tax increment revenues that would have gone to redevelopment agencies must be deposited in a local trust fund each county is required to create and administer. [Citations.] All amounts necessary to satisfy administrative costs, pass-through payments, and enforceable obligations will be allocated for those purposes, while any excess will be deemed property tax revenue and distributed in the same fashion as balances and assets." (*Matosantos*, *supra*, 53 Cal.4th at p. 251.) One section in this part of the dissolution law provides that "*All assets*, properties, contracts, leases, books and records, buildings, and equipment of the former redevelopment agency are transferred . . . to the control of the successor agency, for administration pursuant to the provisions of this part. . . . Any legal or contractual restrictions on the use of these funds or assets shall also be transferred to the successor agency." (§ 34175, subd. (b), italics added.) "All assets" under this statute plainly encompasses loaned money. And although the RDA had a contractual obligation to repay the loans, none of the money lent was restricted, that is, the City makes no claim that the RDA was prevented from using any of the money lent in any particular way.

Thus, it is incumbent on the City to identify any provision of the comprehensive and detailed dissolution law that makes enforceable the particular loans at issue in this case, and it has not attempted to do so. Instead, the City insists that on the effective date

7

of the dissolution law, the RDA possessed certain types of assets that were not subject to disposition by that law, because those assets, due to the encumbrance, actually belonged to the Utility's ratepayers.  The City has provided no authority for this proposition, which undermines the purpose of the dissolution law, namely, to dispose of all assets (§ 34175, subd. (b)) held by the RDA.

What the dissolution law does provide, in part, is that " 'enforceable obligation' does not include any agreements, contracts, or arrangements between the city . . . that created the [RDA] and the former [RDA]."  (§ 34171, subd. (d)(2).)  As the trial court found, the loans from the Utility to the City constitute "agreements, contracts, or arrangements" between the City (acting as its controlled Utility) and the City's RDA.

Thus, we uphold the trial court's finding that no ratepayer money was diverted when the Department sought to implement the dissolution law.  As stated, the Legislature wanted to divert *all* RDA assets, while specifying which RDA *obligations* remained enforceable.  Under section 34171, subdivision (d)(2), the trial court properly denied the City's mandamus petition seeking to treat the debts from the Utility loans that remained on the RDA's books on the effect date of the dissolution law as enforceable obligations.

## II

### *The City's Legal Claims*

We now examine the City's legal claims seriatim.  In doing so, "we are mindful that 'all intendments favor the exercise of the Legislature's plenary authority:  "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action.  Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." ' "  (*Matosantos*, *supra*, 53 Cal.4th at p. 253; see *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.)

A. *Diverting Special Funds*

The City contends the effect of the Department's actions is to divert special funds for an unrelated and, hence, unlawful purpose. We disagree.

Generally speaking legislation cannot permanently divert special funds to unrelated purposes, although legislation allowing or requiring loans of such money is permitted. (See *California Medical Assn v. Brown* (2011) 193 Cal.App.4th 1449, 1456-1458; *Service Employees Internat. Union, Local 1000 v. Brown* (2011) 197 Cal.App.4th 252, 268, fn. 8 [loans are "an integral component of the budgetary calculus"]; *Edgemont Community Service Dist. v. City of Moreno Valley* (1995) 36 Cal.App.4th 1157, 1163-1166; *Veterans of Foreign Wars v. State of California* (1974) 36 Cal.App.3d 688, 694.)

The City's water and light funds collect money from ratepayers to produce and distribute utility services. But, contrary to the City's view, nothing *in the dissolution law* diverted any money from those funds. The Legislature did not divert any money from the Utility funds. That money was diverted *by the city council* years earlier when it loaned money from the Utility to the RDA. Accordingly, we reject the City's legal claims about diversion of special funds.

B. *Change in Statute Triggering a Higher Tax*

The City next contends the Department is unlawfully compelling increased taxes. It reasons that because the loans will not be paid off, Utility rates will have to be raised and therefore, as applied to these facts, the dissolution law increases taxes (as broadly defined as discussed *post*); however, it is uncontested that the dissolution law did not pass by the two-thirds margin necessary to raise taxes.

The dissolution law did not increase taxes nor will it result in any tax increase, which under Propositions 218 and 26 is defined to include certain government charges whether or not denominated as a tax, and require voter approval therefor. (See *Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1319-1329; *Howard Jarvis Taxpayers Association v. City of Roseville* (2002) 97 Cal.App.4th 637, 640-646.)

Utility rates do not increase by operation of law; action is required *by the Utility*, which sets the service rates. (See *American Microsystems, Inc. v. City of Santa Clara* (1982) 137 Cal.App.3d 1037, 1042-1043 ["it is the public entity itself which fixes utility rates"].) The Legislature plays no role in rate setting by municipal utilities.

If the residents of the City believe the unpaid loans have depleted the Utility's funds to the extent that a tax increase is required to ensure appropriate services, they are free to enact such an increase. But *the dissolution law* will not, of itself, result in an increase.[5]

C  *Gift of Public Funds*

The City contends the Department is compelling an unlawful gift of public funds. We disagree with this view.

With exceptions not relevant, "The Legislature shall have no power . . . to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever." (Cal. Const., Art. XVI, § 6.) In part, as the City argues, this provision prohibits taking funds from one group of taxpayers and transferring them to benefit another group of taxpayers unless the funds are used to further the purpose of the donor entity. (See *California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1464, 1469-1473, 1483-1484; *Golden Gate Bridge and Highway Dist. v. Luehring* (1970) 4 Cal.App.3d 204, 206-211.)

Thus, the City's contention echoes the "special funds" contention we have already rejected. The City emphasizes that the money came from the Utility's water and light funds, and argues *the Legislature* has in effect taken ratepayer money from some users--

---

[5] We observe that the trial court found: "Some of these loans were made almost two decades ago, yet no payments had been made by the time the RDA was dissolved. Despite having lost the use of this money for decades, the City has not yet had to raise utility rates."

10

including some outside of the City--and "given" it to "the beneficiaries" of the City's redevelopment projects. The City further observes that, generally speaking, the cancellation of a debt may equate to a "gift" within the meaning of the constitutional proscription against gifts of public funds. (See *Westly v. U.S. Bancorp.* (2003) 114 Cal.App.4th 577, 585.) The City argues the Utility could not have given the money to the RDA, but was required to loan it, to avoid the gift proscription, therefore legislative invalidation of those loans results in a *de facto* gift of public money in violation of the California Constitution.

This contention still does not account for the fact that, once loaned, the *money* in the RDA's coffers was an RDA asset. Neither the Utility, nor its ratepayers, retained any possessory interest in the money lent. As the trial court found: "Section 34171 does not take money from the *ratepayers*. The Dissolution Law only reallocates the former *RDA's* tax increment and assets to other local entities."

D. *Unlawful Takings*

The City contends the Department's actions result in unlawful takings. The Department's actions took money from the RDA, a government entity. No private interests are harmed by such action. As we recently emphasized: "The Legislature is free, within the confines of the California Constitution, to reconfigure and redistribute authority to its subdivisions as it chooses." (*Emeryville*, *supra*, 233 Cal.App.4th at p. 312; see *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6; *Mallon v. City of Long Beach* (1955) 44 Cal.2d 199, 209.) This includes the power to reallocate public money, again, within the confines of the limitations in the California Constitution. But no *taking* of private property--money or an uncollected debt--has occurred in this case, where one political subdivision disgorges assets to another political subdivision.

In the trial court, the City conceded "the federal and state contracts clauses do not forbid the impairment of loans among the City, [the Utility, and the RDA]." But in its

11

reply brief, the City claims standing to sue *on behalf of the ratepayers* as the trustee of the water and light funds, citing various cases.

For example, *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660 involved a city's defensive equal protection challenge to a statute that required changes in local voting to eliminate alleged systemic discrimination. (*Id*. at pp. 671-676.) The court held: "*The point of the no-standing rule is to prevent local governments, whether as plaintiffs or defendants, from using certain provisions of the federal Constitution to obtain invalidation of laws passed by their creator, the state*. This notion has no application where the truly interested parties—citizens or constituents of the local government entity—undisputedly do have standing and the entity merely asserts rights on their behalf." (*Id*. at p. 676, italics added; see *Central Delta Water Agency v. State Water Resources Control Bd*. (1993) 17 Cal.App.4th 621, 630 [entity may challenge "statute or regulation on behalf of its constituents where the constituents' rights . . . are 'inextricably bound up with' the subdivision's duties under its enabling statutes"].)

This case implicates the emphasized language of *Sanchez*: The City, wearing the mantle of trustee of the Utility funds, seeks to use the interests of ratepayers as a shield to thwart its creator's effort to dissolve redevelopment agencies. However, unlike in *Sanchez*, the affected ratepayers are *not* interested parties herein. They long ago paid their utility bills and received the services for which they paid. The Utility then lent some of *its* money to the RDA, receiving in return a promise to repay the loan--a promise that proved riskier than anticipated. Because the money in the RDA coffers was not segregated, and the RDA had no obligation to repay the loans (other than the contractual obligation to the Utility), we fail to see how current ratepayers can advance a constitutional *takings* claim, let alone how the City can advance such a claim on their behalf. As the trial court pointed out, if the ratepayers "have any claim, it is against the City in loaning the ratepayer fees to the RDA, not against the State for dissolving the RDA."

12

## DISPOSITION

The judgment is affirmed.  The plaintiffs shall pay the Department's costs of this appeal.  (See Cal. Rules of Court, rule 8.278.)


      DUARTE      , J.


We concur:


      BLEASE      , Acting P. J.


      BUTZ      , J.

13