DUARTE, J., Concurring and Dissenting
After reconsidering and reviewing this matter further in light of the rehearing petition and answer, I now respectfully dissent from Parts II and IV (in part) because I no longer believe the dissolution statutes worked to impair contracts as to the Avon/Dakota revitalization project. I concur in Part III, as to prejudgment interest. Because Part I was not challenged in the rehearing petition, I will concur in the result therein.[1]
BACKGROUND
On June 22, 2010, the City of Anaheim approved an agreement (dated for identification purposes June 1, 2010), between the Anaheim Housing Authority (Authority) and real party in interest The Related Companies of California LLC (Related) to improve (revitalize) what was characterized as the blighted Avon/Dakota neighborhood. The revitalization agreement provided that one or more "cooperation agreements" between Related and the Authority, the City of Anaheim (City), or the Anaheim Redevelopment Agency (RDA), would use federal, state, and local funds to "provide financial assistance for the Project along with preparation and implementation of the Plan." (Maj. opn., ante , at p. ----.) The Authority would pay Related up to $4.8 million. (Id . at pp. ---- - ----.) Some of this might include money from the RDA's Low and Moderate Income Housing Fund (i.e., housing set-aside funds), which included tax increment revenue that was statutorily designated (under the former Community Redevelopment Law (CRL), later abolished by the Great Dissolution) for use to improve the supply of affordable housing. (Id . at p. ----.) The City and its RDA were specified third party beneficiaries "with full right, but no obligation, to enforce the terms hereof." (Id . at p. ----.) Thus, they could compel compliance therewith, but not themselves be compelled to do anything . Thus, at that point there was no promise that any RDA money would be used for the revitalization project.
Effective June 28, 2010, the Housing Authority, the City, and the RDA entered into a "cooperation agreement" (also dated for identification purposes June 1, 2010) to fund the revitalization agreement. (Maj. opn., ante , at p. ----.) This cooperation agreement (funding agreement) described funding for the revitalization project and *239 also referenced the RDA's statutory obligation under the CRL regarding affordable housing. The funding agreement recited that both the City and the RDA would transfer money to the Housing Authority for its use to implement the revitalization agreement, with the RDA's money to be used consistent with the CRL. (Id . at p. ----.) The maximum amounts the City would transfer ($3.759 million) and the RDA would transfer ($1.041 million) to the Housing Authority equaled the maximum the Housing Authority would have to pay Related for the revitalization agreement (i.e., up to $4.8 million). (See id . at pp. ---- - ---- & fn. 11.) However, the funding agreement did not specifically mention Related.
Effective January 31, 2011 (i.e., during the "fire sale" period after the Great Dissolution was announced but not yet adopted, see City of Grass Valley v. Cohen (2017) 17 Cal.App.5th 567, 574-575 & fn. 2, 225 Cal.Rptr.3d 404 ( Grass Valley )), the Housing Authority and the RDA entered into an "additional funding" agreement (second funding agreement). (Maj. opn., ante , at p. ----.) It, too, references the RDA's duties under the former CRL regarding affordable housing. This second funding agreement recited that the Housing Authority and the RDA wanted the RDA to provide more housing set-aside funds ($15 million more) to the Housing Authority towards the revitalization agreement. It provided that the RDA's obligation would be at the RDA's "option" from funds of the RDA "legally available therefor . The payment obligation ... hereunder does not constitute a pledge of any particular funds and is and shall be subordinate to any pledge or other commitment of the [Housing] Agency made in connection with any [RDA] bonds, now or hereafter issued."[2] (Italics added.) (Id . at p. ----.)
On February 1, 2011, the Housing Authority and Related amended their revitalization agreement, partly to account for the additional $15 million now anticipated to be given by the RDA (thus getting rid of money before it was diverted via the Great Dissolution) to the Housing Authority under the second funding agreement. (Maj. opn., ante , at p. ----.) This amendment to the revitalization agreement also established a schedule for payments from the Housing Authority to Related, including accounting for some payments already made.
The California Department of Finance (Department) initially approved some relevant ROPS items, but later denied others after an administrative meet and confer process in part because the former RDA was not a party to the revitalization agreement, a point the Department reiterated in a later ROPS decision, after this action began. (Maj. opn., ante , pp. ---- - ----.)
DISCUSSION
"This case arises, as have many, from what we have previously characterized as the 'Great Dissolution' of California redevelopment agencies. [Citation.]" ( City of Azusa v. Cohen (2015) 238 Cal.App.4th 619, 622-623, 190 Cal.Rptr.3d 186 ( Azusa ).) Several observations flow therefrom.
First , it is important to keep in mind that the City (as itself), the City (as successor to its former RDA), and the Housing Authority, are each governed by the members of the City Council. This is reflected *240 by the multiple signatures of the same official on relevant agreements in this record. (See fn. 2, ante .)
This circumstance is not unusual in RDA cases, and in fact partly inspired the Great Dissolution, as we have pointed out in other cases. (See, e.g., Azusa , supra , 238 Cal.App.4th at p. 624, 190 Cal.Rptr.3d 186 ["The City, the Utility, and the RDA were governed by the same five elected city council members, and at oral argument on the petition the trial court referenced the 'three different hats' worn. Our Supreme Court has noted that 'the Legislature could well recognize that because of the conjoined nature of the governing boards of redevelopment agencies and their community sponsors, [obligations between them] often were not the product of arm's-length transactions.' [Citation.] The City is the successor agency to the RDA, bestowing yet another 'hat' on city council members"].) The significance of this is that, after the announcement of the Great Dissolution, these agencies were unlikely to have been acting at arm's length with each other.[3]
Second , as just suggested, the timing of relevant actions is critical. What happened after the announcement of the Great Dissolution must be viewed with healthy skepticism, as that is a period identified by the Legislature as one prone to abuse.
"As described by our high court ... Assembly Bill No. 1X 26 consisted of two principal components, codified in two new parts of the Health and Safety Code. Part 1.8 was the 'freeze' provision, effective immediately upon gubernatorial signature on June 28, 2011, and Part 1.85 was the 'dissolution component.' The latter did not become operative until [the lifting of a judicial stay and a judicially reformed] date [of] February 1, 2012. [Citation.]" (Grass Valley , supra , 17 Cal.App.5th at pp. 573-574, 225 Cal.Rptr.3d 404.) Later, "Assembly Bill No. 1484 ... clarified the process of winding down the former RDAs. [Citations.] [ Grass Valley involved] what the parties loosely refer to as 'clawbacks.' (See [Health & Saf. Code] §§ 34179.5, subds. (b) & (c), 34179.6, subds. (c) & (d).) This refers to the administrative unwinding (via the [Due Diligence Review] ) of specified RDA transactions that occurred after the Great Dissolution was proposed in January 2011. The period subject to clawbacks is from January 1, 2011, to June 30, 2012. It includes but is not limited to the approximate six-month period referred to by the parties and described in the legislative history as the 'fire sale' of RDA assets, which lasted until the freeze took effect in June 2011. [Citation.]" ( Id . at p. 574, 225 Cal.Rptr.3d 404.)
As relevant to this case, changes to the funding and revitalization agreements-resulting in formation of the second funding agreement, increasing by more than three times the amount of money potentially to be transferred from the RDA to the Authority, and the amended revitalization agreement-were made after the Great Dissolution was announced, i.e., during the so-called "fire-sale" or "clawback" period. What happened in this case appears to be a by-now typical scramble to evade the intended effects of that sea change in the law. (See fn. 3, ante .)
*241 Third , this court has repeatedly rejected claims that the Great Dissolution impaired any contracts. (See, e.g., Grass Valley , supra , 17 Cal.App.5th at pp. 591-593, 225 Cal.Rptr.3d 404; Cuenca v.Cohen (2017) 8 Cal.App.5th 200, 227-230, 213 Cal.Rptr.3d 689 ; City of San Jose v. Sharma (2016) 5 Cal.App.5th 123, 139-141, 209 Cal.Rptr.3d 420 ; City of Petaluma v. Cohen (2015) 238 Cal.App.4th 1430, 1442, 190 Cal.Rptr.3d 703 ; Brentwood , supra , 237 Cal.App.4th at pp. 503-504, 188 Cal.Rptr.3d 88 ; California Redevelopment Assn. v. Matosantos (2013) 212 Cal.App.4th 1457, 1492-1494, 152 Cal.Rptr.3d 269 ; see also Azusa , supra , 238 Cal.App.4th at pp. 630-631, 190 Cal.Rptr.3d 186.)[4]
Although the majority discusses and factually distinguishes one such case ( Galt ), it does not acknowledge the many others. In my view, there is now a settled general rule against finding an impairment of contracts such that a clear factual or procedural difference must be identified to justify a different result in a given case. For the reasons that follow, I am no longer persuaded that this case presents any material differences that justify refusing to apply the general rule-promulgated by this court-that application of the Great Dissolution does not impair contracts.
The majority holds that the fact that a private entity (Related) is a real party in interest makes a material difference. (Maj. opn., ante , at pp. ---- - ----.) I might agree only if the RDA as a source of contractual payment had been a bargained-for term of Related's contract, which is not the case. The majority states the question "is whether the invalidation of the [RDA's] promise to provide funds to the [Housing Authority], so that the [Housing Authority] could provide them to Related, unconstitutionally impaired Related's contractual rights." (Id . at p. ----.) But the RDA never made such any promise to Related. Nor is Related left without a remedy, as it still has a contract with the Housing Authority.[5] All Related lost was the possibility that the former RDA would contribute money towards the contract. Nothing obligated the former RDA to do so. Absent a legal obligation on the part of the RDA to pay anything toward the Related contract, I do not see how the effective defunding of the RDA (regarding this transaction) impaired Related's enforceable contractual interests.[6]
*242 I agree with the majority that the key dissolution statute is Health and Safety Code, section 34171, subdivision (d)(2),[7] which excludes from the definition of an "enforceable obligation" most contracts between a city and its former RDA. (See maj. opn., ante, at pp. ---- - ----.) The trial court correctly found that the funding agreement was between the former RDA, the City, and the Housing Authority, an entity that the trial court found and the parties agree, is treated by statute (§ 34167.10, subd. (a)) as an arm of the City. Without more, there would be no colorable claim that Related could somehow enforce that agreement.
I also agree with the majority's observation that Related's primary argument is that the statute ( § 34171, subd. (d)(2) ) should not be interpreted so as to invalidate an agreement involving a private party's contract rights. (Maj. opn., ante, at p. ----.) As the majority aptly explains, "The problem with plaintiffs' argument is that they have attempted to frame it as an issue of statutory interpretation, when what they are really raising is an 'as applied' constitutional challenge to the statute." (Id . at p. ----.) But the majority goes on to say that this challenge hinges on "the facts presented by this case." (Id . at p. ----.) I do not agree. While an as-applied challenge may result in a tort suit for damages due to an alleged impairment of contracts, or perhaps for an unconstitutional government taking, this is an administrative mandamus petition seeking to overturn specific ROPS decisions by the Department. It is not a suit for damages for a taking, a breach of contract, or an impairment of contract. Related (and the public entities represented by the same counsel) alleged in their petition that the contracts would not have been made without assurance of RDA funding (i.e., detrimental reliance on promised RDA funding), and alleged the various contracts should be read as one (i.e., Related must be deemed a third party beneficiary in agreements to which it is not explicitly a party). But they did not include in their petition an action for damages for an impairment of contract by the Department, as the majority implies.
We have previously pointed out that "[o]n the face of section 34171(d)(2), there is no exception for an agreement between a former [RDA] and its creator if there is another party to the contract." ( San Bernardino, supra , 242 Cal.App.4th at p. 816, 195 Cal.Rptr.3d 439.) The majority does not explain away this observation. And in any event, the trial court plausibly explained why the revitalization and funding agreements-both later amended-were not "integrated," that is, could not be treated as one over-arching contract. This is so, the trial court found, because although *243 the revitalization agreement anticipated the funding agreement's existence, the funding agreement did not require the RDA to pay anything. Further, the trial court aptly noted that the revitalization agreement specified that the City and its RDA were third party beneficiaries, showing the parties understood the significance of such status, but the funding agreement did not make Related a third party beneficiary. Nor did the revitalization agreement include the funding agreement as one of the various documents deemed integrated with it. The funding agreement cannot be enforced by Related, because Related was neither a named party nor third party beneficiary, and it had no rights thereunder.
The trial court's conclusion seems correct, and indeed, the majority does not directly dispute it. Instead, the majority holds that it is immaterial whether or not the agreements should be treated as integrated, because they are "interdependent." (Maj. opn., ante, at pp. ---- - ----.) No authority is provided for this proposition, nor do I understand how "interdependent" means anything other than integrated in this context.
If there are two distinct contracts, which the trial court found and the majority does not contest, each should be examined in light of the Great Dissolution. If one (the funding agreement) does not create any enforceable obligation because it was made between the former RDA and the City (and the City-controlled Housing Authority) (see § 34171, subd. (d)(2) ), Related's remedy, if any, should be limited to the only contract to which it is a party, that is, the revitalization agreement between Related and the Housing Authority. If Related has performed services under that contract for which it has not been paid, perhaps it has a contract claim against the Housing Authority. But that does not mean it can preclude the administrative unwinding of the funding agreement, as to which it is neither a party nor a third party beneficiary.
But the majority concludes that because the Department disallowed payments (or proposed payments) by the former RDA that were destined for the Housing Authority under the funding agreements but never promised to Related, the Department has thereby unconstitutionally impaired Related's revitalization agreement with the Housing Authority. (Maj. opn., ante , at pp. ---- - ----.) I cannot endorse this view.
Accordingly, I concur in Part III of the opinion but respectfully dissent from Parts II and Part IV (to the extent it endorses Part II), and concur in the result in Part I.

All further section references are to the Health and Safety Code.

My concerns regarding Part I include the implication in the relevant factual recitation that the Department acted improperly by changing its reasons for disapproving ROPS items. (Maj. opn., ante , at pp. ---- - ----.) As the City conceded in the trial court, a typical ROPS finding does not govern a subsequent ROPS decision. (See City of Brentwood v. Campbell (2015) 237 Cal.App.4th 488, 495, 188 Cal.Rptr.3d 88 [ROPS decision included the caveat that " 'An item included on a future ROPS may be denied even if it was not questioned from the preceding ROPS' "] (Brentwood ).) Such caveats were included in the ROPS decisions in this case. It is the Department's final decisions that are now at issue. (Cf. id. at p. 505, 188 Cal.Rptr.3d 88 [Brentwood "had the statutory remedy of petitioning the Department for a 'final and conclusive' determination of approval for subsequent payments for that enforceable obligation"]; see City of Galt v. Cohen (2017) 12 Cal.App.5th 367, 384-385, 218 Cal.Rptr.3d 779.) Thus, suggesting ill will or incompetence on the part of the Department for changing its mind does not help assess the legality of the ROPS denials now at issue. (Cf. Hannon v. Madden (1931) 214 Cal. 251, 268, 5 P.2d 4 [official acts presumed done in good faith, "even though mistakenly performed"]; City of Emeryville v. Cohen (2015) 233 Cal.App.4th 293, 302-303, 182 Cal.Rptr.3d 578 [law presumes officials act in good faith]; Evid. Code, § 664.)

I note the original funding agreement was signed three times by Elisa Stipkovich, in her capacities as executive director of the RDA, and of the Housing Authority, and of the City's Community Development Department, and the second funding agreement was signed twice by Stipkovich, as executive director of both the RDA and of the Housing Authority.

The Governor's January 2011 announcement of the plan to abolish RDAs led to a "frenzy on the part of former [RDAs] and their sponsoring agencies throughout the state to lock up unencumbered tax increment." (City of Tracy v. Cohen (2016) 3 Cal.App.5th 852, 858, 208 Cal.Rptr.3d 128 ; see Brentwood , supra, 237 Cal.App.4th at p. 499, fn. 14, 188 Cal.Rptr.3d 88 [referring to the ensuing "rush" to create "transactions that were not at arm's length"].)

Both parties asked the trial court to judicially notice trial court decisions in other RDA cases, and the trial court granted the requests, but properly declined to treat the decisions as precedential. It should have denied the requests. (See County of San Bernardino v. Cohen (2015) 242 Cal.App.4th 803, 816, 195 Cal.Rptr.3d 439 ["these [trial court RDA decisions] are not even citable under the Rules of Court (Cal. Rules of Court, rule 8.1115 ), and they bear no precedential weight"] (San Bernardino ).)

Related and the Housing Authority, which might otherwise be suing each other, are here represented by the same counsel. I express no view on the propriety of this fact. But the City's view that the Housing Authority has no other funds with which to pay Related raises factual issues not amenable to resolution on appeal in this administrative mandamus case, particularly since the Housing Authority is an arm of the City.

I agree, as this court has held several times, that impairing security can in some circumstances impair contract rights, i.e., even without a present contractual default. (See, e.g., Teacher's Retirement Bd. v. Genest (2007) 154 Cal.App.4th 1012, 1029-1033, 65 Cal.Rptr.3d 326 ; Board of Administration v. Wilson (1997) 52 Cal.App.4th 1109, 1137, 61 Cal.Rptr.2d 207 ; Valdes v. Cory (1983) 139 Cal.App.3d 773, 785-791, 189 Cal.Rptr. 212.) But absent a promise by the RDA to Related, Related's expectations of payment flowing from the RDA were just that: expectations or hopes, not an enforceable right.
I also note that the Department argues the references in the contracts to the CRL manifested an intention that the contracts be governed by any changes thereto. (See City of Torrance v. Workers' Comp. Appeals Bd. (1982) 32 Cal.3d 371, 379, 185 Cal.Rptr. 645, 650 P.2d 1162 [rejecting contract clause claim; " '[When] an instrument provides that it shall be enforced according either to the law generally or to the terms of a particular ... statute, the provision must be interpreted as meaning the law or the statute in the form in which it exists at the time of such enforcement' "]; id ., p. 380, 185 Cal.Rptr. 645, 650 P.2d 1162 ["The City had every reason to anticipate that its rights under those agreements would change over time"]; cf. California Redevelopment Assn. v. Matosantos, supra, 212 Cal.App.4th at p. 1494, 152 Cal.Rptr.3d 269 ["there is no showing ... that any change in the law ... has or will substantially impair any contractual obligation that has been assumed by the successor agencies"].) The City replies that nobody could have predicted the Great Dissolution, which is relevant-if at all-only as to the original revitalization and funding agreements. But I need not resolve that point here.

Further statutory references are to the Health and Safety Code.