Filed 12/22/22  Successor Agency etc. v. L.A. County Second Supervisorial Dist. etc. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SUCCESSOR AGENCY TO THE CARSON REDEVELOPMENT AGENCY,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>LOS ANGELES COUNTY SECOND SUPERVISORIAL DISTRICT CONSOLIDATED OVERSIGHT BOARD et al.,<br><br>        Defendants and Respondents;<br><br>COUNTY OF LOS ANGELES et al.,<br><br>        Real Parties in Interest and Respondents. | C095005<br><br>(Super. Ct. No. 34202080003382CUWMGDS) |

"This case arises, as have many, from what we have previously characterized as the 'Great Dissolution' of California redevelopment agencies."  (*City of Azusa v. Cohen* (2015) 238 Cal.App.4th 619, 622-623 (*Cohen*).)  In short, in 2006, the former Carson Redevelopment Agency (Redevelopment Agency) entered into an owner participation

1

agreement (2006 Agreement) with a developer, Carson Marketplace, LLC (original developer), to remediate and redevelop a site formerly operated, in part, as a municipal landfill (Site).  By 2009, pursuant to a second amendment to the 2006 Agreement, the Redevelopment Agency was contractually obligated to provide $120 million in financial assistance to the original developer.

In 2015, after the Redevelopment Agency had been dissolved, petitioner Successor Agency to the Carson Redevelopment Agency (Successor Agency) entered into a settlement, release, and indemnity agreement (Settlement Agreement) to settle the Redevelopment Agency's remaining enforceable obligation under the 2006 Agreement. In the Settlement Agreement, the parties expressly agreed the Redevelopment Agency's remaining obligation under the 2006 Agreement, and thus the Successor Agency's obligation under the Settlement Agreement, was to provide financial assistance in the amount of $50.5 million.  The Successor Agency subsequently issued $50.5 million in taxable bonds.

In 2020, the Successor Agency sought to issue and sell additional bonds not to exceed $90 million to assist with further remediation at the Site.  Respondent Los Angeles County Second Supervisorial District Consolidated Oversight Board (Oversight Board) denied the Successor Agency's request and respondent Keely M. Bosler,[1] in her former official capacity as Director of the Department of Finance (Department), denied the Successor Agency's request to disburse funds for the anticipated debt service on the newly anticipated bonds.  The Successor Agency filed a petition for writ of mandate (petition), challenging the Oversight Board's and Department's decisions.  The trial court denied the petition; the Successor Agency appeals.

---

[1]     Keely M. Bosler was the Director of the Department of Finance at the time of denial.  Joe Stephenshaw was sworn in as Director of the Department of Finance on August 1, 2022.

The crux of the Successor Agency's arguments is that, when the parties entered into the Settlement Agreement, they intended for the Successor Agency to be obligated to remediate the Site to completion. As such, the Successor Agency asserts the $50.5 million figure in the Settlement Agreement was a mistake of fact (because the parties grossly underestimated the remediation costs) and the Settlement Agreement should be reformed to comport with the intent of the parties and allow for the issuance and sale of the additional bonds.

As we explain, the pertinent question is whether the Successor Agency's newly proposed bonds constitute an enforceable obligation agreed to by *the Redevelopment Agency* prior to June 28, 2011. The answer to that question is, "no." We thus affirm.

LEGAL BACKGROUND

"In the aftermath of World War II, the Legislature authorized the formation of community redevelopment agencies in order to remediate urban decay." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245.) The redevelopment agencies "did not have the power to tax; instead, they financed their activities through 'tax increment financing.' " (*AIDS Healthcare Foundation v. City of Los Angeles* (2022) 78 Cal.App.5th 167, 173 (*AIDS Healthcare Foundation*).) The redevelopment agencies' "system of tax increment financing," however, "became 'a source of contention' " because it decreased the funding available for school districts and other local taxing agencies. (*Id*. at p. 175.) "Amid [the] fiscal crisis in 2011, the Legislature adopted the dissolution law via statutes 'that barred any new redevelopment agency obligations, and established procedures for the windup and dissolution of the obligations of the nearly 400 redevelopment agencies then existing.' " (*Cohen*, *supra*, 238 Cal.App.4th at p. 623.) The redevelopment agencies were dissolved, and the Legislature transferred their assets to successor agencies (*Matosantos*, at p. 251) that "have no 'legal authority to participate in redevelopment activities, except to complete any work related to an approved enforceable obligation' " (*AIDS Healthcare Foundation*, at p. 175).

3

"After the successor agency is created, the successor agency must use the redevelopment agency's last enforceable obligation payment schedule . . . to prepare a recognized obligation payment schedule . . . . [Citation.] The [recognized obligation payment schedule] must identify 'the enforceable obligations of the former redevelopment agency' [citation] and 'project the dates and amounts of scheduled payments for each enforceable obligation for the remainder of the time period during which the redevelopment agency would have been authorized to obligate property tax increment had the redevelopment agency not been dissolved.' " (*AIDS Healthcare Foundation*, *supra*, 78 Cal.App.5th at pp. 178-179.)

Each successor agency is required to "[e]xpeditiously wind down" the former redevelopment agency under "direction of the oversight board." (Health & Saf. Code,[2] § 34177, subd. (h).) "Oversight boards consist of appointed members [citation], and have a fiduciary duty towards 'holders of enforceable obligations and the taxing entities that benefit from distributions of property tax' [citation], including the duty to review actions by successor agencies, such as '[e]stablishment of the Recognized Obligation Payment Schedule' [citation]." (*Cohen*, *supra*, 238 Cal.App.4th at pp. 623-624.)

The enforceable obligations are further "paid only under the oversight of the Department . . . and State Controller." (*City of Oakland v. Department of Finance* (2022) 79 Cal.App.5th 431, 435.) The Department makes a " 'determination of the enforceable obligations and the amounts and funding sources of the enforceable obligations.' " (*AIDS Healthcare Foundation*, *supra*, 78 Cal.App.5th at p. 179.)

---

[2] Further undesignated statutory references are to the Health and Safety Code.

FACTUAL AND PROCEDURAL BACKGROUND

I

*The 2006 Agreement*

The purpose of the 2006 Agreement was to remediate the Site pursuant to the remedial action plan approved by the Department of Toxic Substances Control and to construct improvements pursuant to a specific plan, development agreement, and an environmental impact report (Project).

The parties agreed the Redevelopment Agency would provide "financial assistance," as that term was defined and explained in the method of financing attachment. Section 6.1 of the 2006 Agreement stated: "It shall be the sole responsibility of the [original developer], at the [original developer's] expense (except as otherwise provided in the Method of Financing), to do all of the Remediation Work (provided that, with respect to the Remediation Work, the Financial Assistance shall only be utilized to pay for the Initial Remediation Work)."[3] Section 6.2 further provided: "Except as specifically provided in this Agreement, including the Method of Financing attached hereto, [the original developer] shall bear all costs of constructing all of the Project including the Remediation Work."

The method of financing attachment set "forth the Parties [*sic*] understanding with respect to the financing structure and the obligations and limitations of each Party thereto." In the 2006 Agreement, the method of financing attachment stated the

---

[3]    The term initial remediation work was defined to include various activities in remediating the Site, but excluded the subsequent operation, maintenance, and monitoring of the remedial systems to be installed at the Site and any foundation piling work that formed part of the vertical improvements at the Site. The term remediation work included the initial remediation work; the subsequent operation, maintenance, and monitoring; and any other measures required by the remedial action plan and applicable environmental regulatory requirements.

remediation work was estimated to cost $115 million, $90 million of which constituted the financial assistance agreed to by the Redevelopment Agency.

The parties later entered into two amendments to the 2006 Agreement. The second amendment, dated March 9, 2009, included a method of finance exhibit that replaced the prior method of financing[4] attachment in the 2006 Agreement. The new method of finance exhibit provided the estimated cost of the initial remediation work was $135 million, of which the Redevelopment Agency committed financial assistance of $100 million. The Redevelopment Agency further committed financial assistance of $20 million for public improvements.

Section 3.1 of the method of finance exhibit provided, in pertinent part, that, "[w]ith the exception of the Financial Assistance set forth in this Agreement, [the original developer] or its successors and assigns shall have the complete financial obligation for all costs of the Initial Remediation Work and the Participant Public Improvements." Section 5.2 of the method of finance exhibit further provided, in pertinent part: "In no event shall the Agency's total Financial Assistance . . . exceed the lesser of the [total actual costs (as that term is defined) of the initial remediation work and the construction of public improvements] or [$120 million]."

II

*The Settlement Agreement*

On May 12, 2015, the City of Carson, the Carson Reclamation Authority (a California Joint Powers Authority), the Successor Agency, and the original developer entered into the Settlement Agreement. The Settlement Agreement recited, in pertinent part: the original developer and the Redevelopment Agency had previously entered into the 2006 Agreement; under the 2006 Agreement, the Redevelopment Agency was

---

[4]    This is not a typographical error. The 2006 Agreement had a method of financing attachment whereas the second amendment had a method of finance exhibit.

6

obligated to provide financial assistance for the initial remediation work; the Redevelopment Agency "made previous payments to a remediation escrow"; and "[p]ursuant to the [2006 Agreement], [the] Successor Agency [wa]s obligated to issue additional bonds and/or provide other assistance totaling $50.5 million for remediation and Infrastructure."

The method of finance exhibit to the Settlement Agreement stated it replaced the prior obligations imposed in the 2006 Agreement, as amended, and set forth "the agreement with respect to the financing structure and Successor Agency['s] financial assistance pursuant to the [Settlement] Agreement." As to the Successor Agency's financial assistance obligation, the method of finance exhibit stated: "The obligation to fund the remaining $50.5 million of the total $120 million financial assistance for the costs of the [*sic*] funding the remediation activities at the [Site] in accordance with the [Settlement] Agreement is a recognized enforceable obligation of the Successor Agency payable from moneys deposited from time to time in the Successor Agency's Redevelopment Property Tax Trust Fund. Consistent with the Successor Agency's enforceable obligations and Section 7 of the [Settlement] Agreement, the Successor Agency hereby commits to fund the remaining $50.5 million financial assistance required by Section 7 of the [Settlement] Agreement." The method of finance exhibit also required that "[t]he $50.5 million of financial assistance from Successor Agency will be spent by the [Carson Reclamation Authority] to complete the remediation of the [Site]."

The Oversight Board approved the Settlement Agreement on April 23, 2015, prior to the parties executing the Settlement Agreement. In its resolution, the Oversight Board explained: the Redevelopment Agency was obligated to provide $120 million in financial assistance under the 2006 Agreement; the Redevelopment Agency and the Successor Agency had already paid $69.5 million of the $120 million; the outstanding balance of the Redevelopment Agency's obligation under the 2006 Agreement was thus $50.5 million; and the Settlement Agreement "essentially replace[d] the prior obligations

7

imposed by the [2006 Agreement] and set[] forth a new 'Method of Finance' for the outstanding $50.5 million, making such funding available for the [Carson Reclamation Authority] to complete Site remediation and public infrastructure." The Department, on April 27, 2015, reviewed the Oversight Board's resolution and approved the Settlement Agreement.

The Successor Agency subsequently issued $50.5 million in taxable bonds.

III

*The Successor Agency's 2020 Request To Issue New Bonds*

On January 8, 2020, the Successor Agency sent a letter to the Department seeking approval to issue and sell approximately $80 million in bonds "in order to satisfy the Successor Agency's existing and outstanding enforceable obligations for the completion of environmental remediation of the [Site]."

On January 28, 2020, the Oversight Board approved the Successor Agency's annual recognized obligation payment schedule for the period of July 1, 2020, through June 30, 2021 (schedule). Included in the schedule was a line item for $8.5 million with the description: "Bond issued to fund a pre-existing obligation pertaining to environmental remediation pursuant to a Settlement Agreement." The Successor Agency submitted the schedule to the Department for review.

Also on January 28, 2020, the Successor Agency approved a resolution for the issuance of new bonds (not to exceed $90 million) and submitted the resolution to the Oversight Board for approval.[5] The Oversight Board ultimately denied the request on April 21, 2020, with two votes in favor of adopting a resolution directing and approving the issuance of the new bonds and two votes against the request.

---

[5] Oversight boards must approve proposals to issue bonds or other indebtedness or any pledge of property tax revenues. (§§ 34180, subd. (b), 34177.5, subd. (f).)

In April 2020, the Department further advised the Successor Agency that the $8.5 million line item in the submitted annual recognized obligation payment schedule was "not allowed." The Department wrote it disapproved of the line item because the Successor Agency had not received approval from the Oversight Board for the issuance of new bonds and "there is no obligation of the [Successor] Agency to fund any remediation costs or issue debt for such costs." The Department explained, "while the 2015 Settlement Agreement required the [Successor] Agency to issue bonds in an amount to deposit a net $50.5 million in proceeds with the Carson Reclamation Authority . . . , this obligation was satisfied with the issuance of the [Successor] Agency's 2015 Subordinate Tax Allocation Bonds, Series B. With the prior satisfaction of the [Successor] Agency's obligation to deposit $50.5 million of bond proceeds, there is no further obligation of the Agency related to remediation costs." The Department also noted that the 2006 Agreement placed the obligation for remediation and payment of remediation costs on the original developer and, under the Settlement Agreement, Carson Reclamation Authority assumed the original developer's obligations, including payment of the remediation costs.

The Successor Agency requested to meet and confer regarding the Department's letter. Following the meet and confer meeting, the Department "continue[d] to deny this item." The Department reiterated: "[U]pon the execution of the Settlement Agreement, the only remaining obligation of the [Successor] Agency was the issuance of bonds to net $50.5 million in bond proceeds to be transferred to the [Carson Reclamation Authority]. Upon the completion of this obligation in 2015, the [Successor] Agency's obligations under the Settlement Agreement ceased. Nothing raised in the Meet and Confer process supports any different conclusion." The Department further stated, "[s]ince the [Successor] Agency has requested and failed to receive Oversight Board approval for the issuance of these bonds, and because there is no obligation of the [Successor] Agency to

9

either fund any remediation costs nor issue debt for such costs, this line item is not approved and the requested amount of $8,500,000 is not allowed."

IV

*The Petition And Trial Court's Decision*

The Successor Agency filed the petition in the trial court, seeking review of the Oversight Board's and Department's decisions relating to the request to issue, sell, and finance the additional bonds.

The Successor Agency asserted the newly requested bond issuance was "intended to satisfy the Successor Agency's existing and outstanding enforceable obligations to finance to completion significant environmental remediation obligations established in various contracts between the [Redevelopment Agency] and private parties, an environmental Remedial Action Plan approved by the California Department of Toxic Substances Control . . . , and various judicially-enforceable consent decrees attendant thereto." It alleged: the Redevelopment Agency was obligated to provide $120 million under the 2006 Agreement; in the midst of negotiations with the original developer in 2012 regarding the escalation of costs at the Site due to the "Great Recession," the Redevelopment Agency was dissolved; the Successor Agency assumed the Redevelopment Agency's obligations under the 2006 Agreement and continued negotiations with the original developer "where they left-off" with the Redevelopment Agency; ultimately, disputes and obligations under the 2006 Agreement were resolved in the Settlement Agreement; in the Settlement Agreement, the parties agreed the original developer would transfer the interest in the Site to the Carson Reclamation Agency in exchange for certain concessions, including that the Successor Agency would indemnify the original developer for environmental liabilities associated with the cleanup at the Site and the Successor Agency would fund the Carson Reclamation Agency's "costs of remediation of the environmental contamination conditions at the Site"; "[w]ith the Settlement Agreement confirmed as an enforceable obligation, the [Carson Reclamation

10

Authority] acquired the Site on May 20, 2015, and the Successor Agency issued" $50.5 million in bonds; the remediation costs for the Site subsequently escalated; "[t]o resolve the worsening funding shortfalls attendant to the Remedial Systems, and to facilitate compliance with the [remedial action plan] and Consent Decrees, the Successor Agency considered issuance of" additional bonds "not to exceed $90 million"; and the Oversight Board and Department wrongfully denied approval of those bonds and attendant costs.

The trial court denied the petition, finding "no enforceable obligation remains warranting issuance of the bonds." The trial court reasoned "no contract requires the Successor Agency to continue to fund remediation at the Site. Because the former [Redevelopment Agency] had no contractual obligation to fund continued development, and because nothing in the Settlement Agreement directly obligates the Successor Agency to issue more bonds or commit more money, there is no further enforceable obligation of the Successor Agency." The trial court found the Redevelopment Agency's obligation under the 2006 Agreement was fixed and, in the Settlement Agreement, the Successor Agency only recommitted to contribute the $50.5 million that remained of the Redevelopment Agency's obligation under the 2006 Agreement.

The trial court rejected, among other arguments, the Successor Agency's argument that the indemnity clause in the Settlement Agreement required the Successor Agency to complete the remediation at the Site. The trial court explained the indemnity provision survived only until the $50.5 million obligation was met. The trial court further rejected the Successor Agency's request to reform the Settlement Agreement under the mistake of fact doctrine. The trial court found the doctrine inapplicable and that the Successor Agency presented no competent evidence to support the facts purportedly constituting the mistake of fact. Finally, the trial court found no statutory provision mandating reformation of the Settlement Agreement.

The Successor Agency appeals.

11

DISCUSSION

The Successor Agency seeks to reform the Settlement Agreement due to a mistake of fact, arguing the $50.5 million in financial assistance it agreed to in the Settlement Agreement was "mistakenly and grossly underestimated" and the Settlement Agreement clearly establishes it "is subject to an enforceable obligation to fund Site remediation to actual completion." The Successor Agency asserts the trial court erred in finding (1) no evidence established the asserted mistake of fact existed, and (2) the claimed mistake pertained to changed circumstances following the execution of the Settlement Agreement. The Successor Agency further argues section 34181, subdivision (e) supports its position because the statute provides, " '[t]he board may approve any amendments to or early termination of those agreements if it finds that amendments or early termination would be in the best interests of the taxing entities."

We need not and do not examine whether the trial court erred in finding the Successor Agency failed to show a mistake of fact existed sufficient to support reformation of the Settlement Agreement. Even if the trial court erred in that regard, as the Successor Agency asserts, the conclusion would not require reversal because the relief the Successor Agency seeks is barred by section 34177.3, subdivision (a).[6, 7]

_____

[6]    The Department raised this argument in its respondent's brief; the Successor Agency did not address the statute in its reply brief.

[7]    Because we conclude the relief sought in this lawsuit is barred by statute, we need not and do not consider the Oversight Board's argument that the Successor Agency failed to exhaust its administrative remedies. (See *California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 252, fn. 8.) Further, it appears the argument is forfeited because the Oversight Board has cited to nothing in the record indicating that it made the failure to exhaust argument in the trial court, nor have we found any such argument in the Oversight Board's opposition brief filed in the trial court. (See *Briley v. City of West Covina* (2021) 66 Cal.App.5th 119, 131, fn. 6.)

12

Reformation is an equitable remedy. (*Jones v. First American Title Ins. Co.* (2003) 107 Cal.App.4th 381, 388.) "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." (Civ. Code, § 3399.) "Reformation is not the court *creating* a *new* agreement but rather *enforcing* the *actual* agreement *already made* by the parties." (*Panterra GP, Inc. v. Superior Court* (2022) 74 Cal.App.5th 697, 713-714.)

As proposed by the Successor Agency, the actual agreement made by the parties to the Settlement Agreement was that the Successor Agency "is subject to an enforceable obligation to fund Site remediation to actual completion." The problem with this assertion is that reformation of the Settlement Agreement in the manner advanced by the Successor Agency would create a new and increased enforceable obligation *for the Redevelopment Agency* post June 28, 2011, in violation of section 34177.3, subdivision (a). That statute provides: "Successor agencies shall lack the authority to, and shall not, create new enforceable obligations or begin redevelopment work, *except in compliance with an enforceable obligation, as defined by subdivision (d) of Section 34171, that existed prior to June 28, 2011*." (§ 34177.3, subd. (a), italics added.)

The Redevelopment Agency's existing enforceable obligation prior to June 28, 2011, was its financial assistance obligation under the 2006 Agreement.[8] (§ 34171, subd. (d)(1)(E) [enforceable obligation includes "[a]ny legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public

---

[8] The Settlement Agreement was executed in 2015 and thus could not establish the Redevelopment Agency's enforceable obligation in existence prior to June 28, 2011.

policy"].) Whatever mistake of fact the parties to the Settlement Agreement might have had is irrelevant to determining the enforceable obligation *under the 2006 Agreement*.

It is clear the Redevelopment Agency's financial assistance obligation under the second amendment to the 2006 Agreement (dated March 9, 2009), was limited to $120 million. Indeed, section 3.2 of the method of finance exhibit provided, in pertinent part, that in no event shall the Redevelopment Agency's financial assistance exceed *the lesser of* the total actual costs (as that term is defined) of the initial remediation work and the construction of public improvements *or* $120 million. Thus, *at most*, the Redevelopment Agency was obligated to provide financial assistance of $120 million. Section 3.1 of the method of finance exhibit further provided that, with the exception of the $120 million in financial assistance committed to by the Redevelopment Agency, the original developer or its successors and assigns "*shall have the complete financial obligation for all costs of the Initial Remediation Work and the Participant Public Improvements*." (Italics added.)

It is also clear that, when the parties entered into the Settlement Agreement, the Redevelopment Agency's remaining financial assistance obligation under the 2006 Agreement was $50.5 million. The Settlement Agreement expressly stated "[t]he obligation to fund the remaining $50.5 million of the total $120 million financial assistance for the costs of the [*sic*] funding the remediation activities at the [Site] in accordance with the [Settlement] Agreement is a recognized enforceable obligation of the Successor Agency"; and, the Oversight Board's resolution approving the Settlement Agreement stated the Redevelopment Agency and Successor Agency had already paid $69.5 million of the $120 million and the outstanding balance of the Redevelopment Agency's obligation under the 2006 Agreement was thus $50.5 million.

From the foregoing, it is undisputed that the Redevelopment Agency's *remaining* enforceable obligation under the 2006 Agreement, *prior to June 28, 2011*, was *limited to* the agreed-upon $50.5 million, as identified in the Settlement Agreement. As the Successor Agency acknowledges, it is "charged with fulfilling the contractual obligations

14

of the former Carson Redevelopment Agency."  The Successor Agency is "without any legal authority to participate in redevelopment activities, except to complete any work related to an enforceable obligation."  (§ 34173, subd. (g).)  We will not, in equity, reform a contract to violate section 34177.3, subdivision (a) and give the Successor Agency legal authority otherwise precluded by statute.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1)-(2).)

/s/\
Robie, Acting P. J.

We concur:

/s/\
Hoch, J.

/s/\
Boulware Eurie, J.