Filed 11/30/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| COUNTY OF SAN BERNARDINO et al., | C074413 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2013-80001420-CU-WM-GDS) |
| v. | |
| MICHAEL COHEN, as Director, etc., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Eugene L. Balonon, Judge. Affirmed.

Burke, Williams & Sorensen, Amy E. Hoyt, J. Leah Castella, Susan E. Bloch, and Nicholas J. Muscolino for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Marc A. LeForestier, Kari Krogseng and P. Patty Li, Deputy Attorneys General, for Defendant and Respondent.

1

When the Legislature dissolved redevelopment agencies, it provided that any agreement between the redevelopment agency and the municipal government that created the redevelopment agency is not an enforceable obligation. (Health & Saf. Code, former § 34171, subdivision (d)(2) (Stats. 2011-2012, 1st Ex. Sess., ch. 5, § 7; Stats. 2012, ch. 26, § 6) (hereafter, § 34171(d)(2)).) Here, plaintiff County of San Bernardino loaned the San Bernardino County Redevelopment Agency $10 million. When the redevelopment agency was dissolved, $9 million of those funds remained in the former redevelopment agency's coffers. Defendant Department of Finance determined that the loan agreement is unenforceable.

We agree with the Department of Finance and the trial court, which upheld the action of the Department of Finance. And we reject the County's contentions on appeal that the determination of the Department of Finance (1) violated the constitutional prohibitions on the state's reallocation of tax revenues; (2) improperly concluded that the loan is not an enforceable obligation; and (3) was inequitable.

BACKGROUND

In October 2003, a fire devastated the community of Cedar Glen in San Bernardino County. To assist in rebuilding the community, including infrastructure, the County created the Cedar Glen Disaster Recovery Project Area and the Cedar Glen Disaster Recovery Plan. The county ordinance charged the preexisting San Bernardino County Redevelopment Agency, which was created by the County, with principal responsibility to carry out the disaster recovery plan.

In 2005, the County loaned the former redevelopment agency $10 million from its general fund for the Cedar Glen improvements. In 2009, the County and the former redevelopment agency executed an agreement called the Service Area 70-CG Agreement, which earmarked $4 million of the loan (hereafter, the County Loan) to provide water and road infrastructure improvements in Cedar Glen. By 2012, however, $9 million of the County Loan to the redevelopment agency remained unspent.

2

By legislation adopted in 2011 and 2012, the Legislature ended redevelopment in California in order to recapture the tax revenue that had been flowing to redevelopment agencies and distribute it to other taxing entities.  (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 247-249 (*Matosantos*).)  It enacted Assembly Bill No. 1X 26 in 2011 (2011-2012 1st Ex. Sess.) (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 7) and Assembly Bill No. 1X 1484 in 2012 (2011-2012 Reg. Sess. (Stats. 2012, ch. 26, §§ 6-35) (collectively, the Dissolution Law) to dissolve redevelopment agencies, end tax-increment financing, establish successor agencies to deal with the former redevelopment agencies' enforceable obligations, and redirect remaining unencumbered agency revenues and assets to other taxing entities.  (Health & Saf. Code, §§ 34161 et seq., 34177, subds. (a), (c) (hereafter, unspecified code citations are to the Health & Safety Code).)  The County became the successor agency of the now dissolved San Bernardino County Redevelopment Agency for the purpose of winding down the affairs of the former redevelopment agency.  (In this opinion, we refer to the County both in its general capacity and in its separate capacity as the successor agency of the former redevelopment agency simply as "the County," unless further specificity is required.)

For purposes of the Dissolution Law, the term "enforceable obligation" means such things as bonds, loans of money, payments required by federal or state law, payments required in connection with the agencies' employees, and contracts necessary for the successor agency's operation.  (§ 34171, subd. (d)(1).)  As relevant here, " 'enforceable obligation' does not include any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency."  (§ 34171(d)(2).)  There are statutory exceptions to this limitation on the definition of "enforceable obligations," but the parties do not assert that any of them applies under the circumstances of this action.

It is undisputed in this action that the County created the former redevelopment agency and that the loan to the former redevelopment agency was the result of an

3

agreement, contract, or arrangement between the County and the former redevelopment agency.

In order to make a payment required by an enforceable obligation, a successor agency must apply to the Department of Finance for approval. It does this by preparing a schedule of the enforceable obligations it believes it must continue to pay. This schedule, called a Recognized Obligation Payment Schedule (ROPS), is prepared for each six-month fiscal period. (§ 34177, subd. (*l*)(1).) The successor agency's oversight board must approve the ROPS. (§ 34180, subd. (g).) Then, the agency submits the ROPS to the Department of Finance for its approval. (§ 34177, subd. (*l*)(2).) The Department of Finance may eliminate any obligation listed on a ROPS. (§§ 34177, subd. (m), 34179, subd. (h).) Any funds remaining after payment of the approved enforceable obligations are available for distribution to local taxing entities. (§ 34182, subd. (c)(2).)

In this case, the County included payment of its loan to the former redevelopment agency as one of the enforceable obligations in this list sent to the Department of Finance. But the Department of Finance rejected payment of the loan because the loan was an agreement, contract, or arrangement between the former redevelopment agency and the municipal government that created the redevelopment agency. (§ 34171(d)(2).)

The County petitioned the trial court for a writ of mandate against the Department of Finance, arguing that the County Loan is an enforceable obligation, for various reasons. The trial court rejected each reason and entered judgment for the Department of Finance.

The parties also recount what happened after entry of judgment in the trial court.[1]

---

[1] The County's request for judicial notice filed December 24, 2013, is granted as to exhibits 1 through 5 and denied as to exhibits 6 and 7. (Exhibits 6 & 7 are superior court rulings in unrelated matters.) The County's request for judicial notice filed April 9, 2014, and the Department of Finance's request for judicial notice filed March 19, 2014, are granted.

4

When an agreement such as the County's loan to the former redevelopment agency has been rejected by the Department of Finance because it is not an enforceable obligation, there is a process to make it an enforceable obligation. After the Department of Finance issues a "finding of completion," meaning the successor agency has complied with the statutes concerning disbursement of the assets of the former redevelopment agency, the loan may be repaid if an oversight board finds it was for legitimate redevelopment purposes. (See §§ 34179.6, 34179.7, 34191.4, subd. (b)(1).) But if that happens, the interest rate is recalculated, and 20 percent of the loan repayment must be transferred to the "Low and Moderate Income Housing Asset Fund." (See § 34191.4, subd. (b)(2).)

After the trial court's judgment in this case, the County disbursed the remaining funds from the loan as required, but under protest, and received from the Department of Finance a finding of completion. The County may now seek a determination by the oversight board finding that the County Loan was for a legitimate redevelopment purpose.

STANDARD OF REVIEW

Here, the facts are undisputed, but the parties dispute how the law is to be applied. "While we accord at least ' " 'weak deference' " ' to an agency's interpretation of its governing statutes where its expertise gives it superior qualifications to do so (in contrast with the ' " 'strong deference' " ' standard in other jurisdictions), the issue is one ultimately subject to our de novo review. [Citation.]" (*City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 500.)

DISCUSSION

I

*Constitutionality of Distribution of Loan Proceeds*

The County contends that the Department of Finance's rejection of the County Loan under section 34171(d)(2) violated two provisions of the California Constitution

5

(Art. XIII, §§ 24 & 25.5) because the action constituted a reallocation of local tax revenues by the state. The contention is without merit because the money loaned to the former redevelopment agency did not retain its character as tax revenue. Therefore, when the Department of Finance rejected the loan, it did not reallocate tax revenue.

The provision of the Dissolution Law at issue, former section 34171(d)(2), stated, in full: "For purposes of this part, 'enforceable obligation' does not include any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency. However, written agreements entered into (A) at the time of issuance, but in no event later than December 31, 2010, of indebtedness obligations, and (B) solely for the purpose of securing or repaying those indebtedness obligations may be deemed enforceable obligations for purposes of this part. Notwithstanding this paragraph, loan agreements entered into between the redevelopment agency and the city, county, or city and county that created it, within two years of the date of creation of the redevelopment agency, may be deemed to be enforceable obligations." (Stats. 2011-2012, 1st Ex. Sess., ch. 5, § 7; Stats. 2012, ch. 26, § 6.) The County does not assert that any exception contained in the text of this provision applies to the County Loan.

Article XIII, section 24, subdivision (b), of the California Constitution (Prop. 22) provides: "The Legislature may not reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government's purposes." Similarly, section 25.5, subdivision (a)(3), of the same article (Prop. 1A) provides that the Legislature may not "change for any fiscal year the pro rata shares in which ad valorem property tax revenues are allocated among local agencies in a county other than pursuant to a bill passed in each house of the Legislature by rollcall vote entered in the journal, two-thirds of the membership concurring."

The County argues: "Quite simply, Article XIII § 25.5 precludes the State from requiring a reallocation of tax revenues to other local government entities. The [Department of Finance] cannot achieve the same unconstitutional result by requiring [the successor agency] to distribute the County's General Funds after dissolution." The County also argues the Department of Finance's rejection of the County Loan violated article XIII, section 24 for the same reason. The problem with the County's argument appears on its face. The former redevelopment agency did not hold "the County's General Funds," to use the County's term; instead, the former redevelopment agency held money that the County loaned to it. The money was a loan with no resulting tax character.

The County's argument runs off a logical cliff before even approaching the promised land. Because the County loaned money to the former redevelopment agency, the former redevelopment agency did not receive or hold the money as part of a tax allocation. The County argues that "there is no authority for the proposition that the County's decision to loan General Fund money to [the former redevelopment agency] to finance critically-needed infrastructure improvements strips that money of its character as property, sales, and use taxes." Nonetheless, logic dictates that money spent by the County is no longer tax revenue when it arrives at its destination. It would be nonsensical, for example, to argue that money spent on office supplies still held its character as tax revenue in the hands of the business providing office supplies. Likewise, money loaned by the County, even if the County obtained those funds as an allocation of taxes, does not retain its character as tax revenue in the hands of the borrower.

The County provides no authority for the proposition that, once the County obtains money from real property and other taxes, it retains its character as tax revenue when it is spent. The County argues that "the manner in which funds are expended does not change where those funds came from – sales, use and property taxes are still sales, use and property taxes even when they are loaned to a redevelopment agency." This is true as far

7

as it goes.  The County may spend tax revenue, but the recipient does not receive it as tax revenue.  Here, the Department of Finance is not attempting to direct the County to distribute or reallocate tax revenue; instead, it is directing the County, as the successor agency, to distribute loan proceeds, consistent with the Dissolution Law.

Therefore, contrary to the County's contention, the Department of Finance did not require the County to "distribute the County's General Funds . . . ."

This case is unlike *Matosantos*, where the argument was made that the state could not redirect tax-increment revenue allocated to the redevelopment agencies.  There, the argument could be made, even though it ultimately failed, that the former redevelopment agencies that received tax-increment revenue could not be directed by the Legislature to redistribute it to the trust fund for the purpose of reallocating it to local agencies and school entities.  Here, the former redevelopment agency received the funds as a loan, not as a distribution of a tax.  Therefore, this situation does not even raise the issue of reallocation of tax revenue and does not implicate article XIII, sections 24 and 25.5 of the California Constitution.

This court recently reached the same result in a similar case, *City of Azusa v. Cohen* (2015) 238 Cal.App.4th 619 (*Azusa*).  In *Azusa*, the city's municipal utility loaned money to the redevelopment agency.  As in this case, the Department of Finance rejected the loans because they were agreements between the city that created the redevelopment agency and the former redevelopment agency.  (§ 34171(d)(2).)  Disagreeing with the city's claim that the loans constituted "ratepayer money" entitled to protection from diversion for a different purpose, we held that once the money was loaned to the redevelopment agency it ceased to be ratepayer money.  (*Azusa, supra,* at pp. 623.)

Here, when the County loaned money to the former redevelopment agency, that money ceased to be part of the County's general fund consisting of tax revenue. Therefore, the County cannot claim that the remaining loan funds must be treated as tax revenue for the purpose of this constitutional challenge to the Legislature's authority to

8

prescribe what is done with the money left in the hands of the former redevelopment agency when it was dissolved.

In its reply brief and again at oral argument, the County argued that the funds loaned to the former redevelopment agency retained their character as tax revenue because "the County imposed contingencies on the loan proceeds." This contention has no merit because (1) the record does not support the allegation of contingencies on the actual loan and (2) the placement of such "contingencies" did not mean that the funds transferred to the former redevelopment agency retained their character as tax revenue.

The document memorializing the County Loan provided that the loan was "for the purpose of undertaking various road and water improvements, providing financial assistance to residential households; providing financial assistance to commercial operation in the Project, and purchasing land within the Project Area." Despite this recitation of the purpose of the loan, nothing in this document required the former redevelopment agency to obtain approval from the County before expending the loaned funds.

A schedule of items and the amounts allocated to those items (such as business assistance programs, road construction, water construction) appears in the administrative record immediately after the County Loan document; however, there is nothing in the County Loan document incorporating this schedule of items, and the schedule of items is not included in the express page numbering (for example, "Page 4 of 4") of the County Loan document. The County provides no record citation establishing that this schedule of items was included in the County Loan document.

The County cites staff reports as support for its allegation that there were contingencies attached to the former redevelopment agency's use of the County Loan funds, but those staff reports were not part of any loan agreement that we have been shown. Accordingly, the record does not reflect that the alleged contingencies were part of the loan agreement.

9

We also conclude that, even if the County had successfully established that the former redevelopment agency's use of the County Loan funds was contingent on the County's approval, any such contingencies did not cause the loaned funds to retain their character as tax revenue. As noted, the funds were transferred to the former redevelopment agency for redevelopment purposes. They were no longer in the County's coffers. Once that money was transferred by the County, it was not tax revenue, even if the County had some say in how the funds were spent.

The County cites *Professional Engineers v. Wilson* (1998) 61 Cal.App.4th 1013 (*Professional Engineers*), in which this court held that the use of funds obtained from a gas tax could not be used to make payments on rail bonds (a use not permitted by the gas tax legislation, which allowed use of the tax revenue for highway purposes only) even though the gas tax funds had been commingled in the general fund. Since the funds were traceable directly to the gas tax, the law required that they be spent only in accordance with the gas tax legislation. (*Id*. at pp. 1023-1028.)

*Professional Engineers* does not support the County's argument. There, the County spent the gas tax funds in a manner contrary to law. Here, however, the funds were spent consistent with the law, to fund the former redevelopment agency. That there may have been contingencies on how the former redevelopment agency could, itself, spend those funds did not cause the funds to retain their character as tax revenue. In *Professional Engineers*, the gas tax funds retained their character as gas tax revenue while in the County's general fund, but the funds at issue in this case were no longer in the County's general fund. They had been transferred to the former redevelopment agency.

The County also cites *Collier v. City and County of San Francisco* (2007) 151 Cal.App.4th 1326 (*Collier*). In that case, the city transferred revenue from building permit fees to other departments in contravention of the limitation that building permit fees could not be " ' " 'levied for unrelated revenue purposes.' " ' " (*Id*. at p. 1338; see

10

also *Shaw v. People ex rel. Chiang* (2009) 175 Cal.App.4th 577 [state cannot use gas tax for unauthorized purposes].)  Here, there was no such unlawful transfer, and the transfer took the funds out of the County's coffers, not to a different department of the County. *Collier* also does not support the County's argument.

Accordingly, as we noted, when the County Loan money left the County's coffers and was deposited into the former redevelopment agency's account as a loan, that money was no longer tax revenue.  The Dissolution Law's allocation of those funds did not violate article XIII, sections 24 or 25.5 of the California Constitution.

II

*Enforceable Obligation*

The County contends that its loan to the former redevelopment agency falls under the statutory definition of "enforceable obligation" and that the agreement is an enforceable obligation because there are third party beneficiaries and, therefore, the agreement was not made exclusively between the County and the former redevelopment agency .  Neither contention has merit.

A.      *Statutory Definition*

As we recounted above, under the Dissolution Law " 'enforceable obligation' does not include any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency."  (§ 34171(d)(2).)  On the other hand, the same section of the Health and Safety Code includes in the definition of "enforceable obligation" both "[l]oans of moneys borrowed by the redevelopment agency" and "[a]ny legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy."  (§ 34171, subd. (d)(1)(B) & (E).)

The County cites the latter two provisions and declares that the County Loan is an enforceable obligation without explaining why the other provision making agreements between the County and its former redevelopment agency unenforceable does not apply.

11

Consistent with the interpretation of the Department of Finance and the trial court, we conclude that the overriding provision is the one limiting the definition of enforceable obligation. Any other interpretation would render it meaningless.

On its face, the statutory exclusion of agreements such as the County Loan from the definition of "enforceable obligations" identifies the extent of the exclusion: "For the purposes of this part . . . ." (§ 34171(d)(2).) "This part" is the Dissolution Law, set forth in part 1.85 of division 24 of the Health and Safety Code. Therefore, for purposes of the Dissolution Law, the exclusion in section 34171(d)(2) applies to all "agreements . . . between the . . . county . . . that created the redevelopment agency and the former redevelopment agency" (§ 34171(d)(2)), such as the County Loan here.

Construing the Dissolution Law and the cited statutes to mean that agreements between the County and the former redevelopment agency are enforceable obligations would negate the intent of the Legislature, as shown by the words used, to make such agreements unenforceable. Accordingly, the language of the statutes supports only our interpretation, excluding the County Loan from the definition of "enforceable obligations."

B.     *Third party Beneficiary*

The County further argues that its loan to the former redevelopment agency is enforceable because it included third party beneficiaries (Cedar Glen ratepayers) and, therefore, was not *exclusively* between the County and the former redevelopment agency. The County claims that "the Service Area CG 70-CG Ratepayers ('Ratepayers') are express beneficiaries of County Loan." (*Sic*.) This argument is without merit because the statutory language applies to all agreements between a former redevelopment agency and its creator, without mention of possible benefits that ratepayers may have obtained through performance of the agreement. The word "exclusively" is not in the statute.

The County contends that, if there is a third party beneficiary to the County Loan, then the provision excluding a former redevelopment agency's agreements with its

12

creator from the definition of "enforceable obligation" (§ 34171(d)(2)) does not apply. The County argues: "[B]ecause the County Loan is between the County, [the former redevelopment agency], *and* third parties, § 34171(d)(2) does not invalidate the loan." (Original italics.) To the contrary, the language of the statute does not support this interpretation.

This is a question of statutory interpretation, which means that our task is to determine whether the Legislature intended to allow an agreement between a former redevelopment agency and its creator to be an enforceable obligation if anyone could be identified as a third party beneficiary of the agreement. The fundamental objective of statutory interpretation is to determine the Legislature's intent. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.)

On the face of section 34171(d)(2), there is no exception for an agreement between a former redevelopment agency and its creator if there is another party to the contract. And the only authority the County cites is to "trial courts [that] have found that § 34171(d)(2) only invalidates agreements made *exclusively* between a city or county and its [former redevelopment agency]." (Original italics.) The County requests us to take judicial notice of these cases. However, these cases are not even citable under the Rules of Court (Cal. Rules of Court, rule 8.1115), and they bear no precedential weight in the Court of Appeal.

The County also relies, for its interpretation of the provision, on the Legislature's intent to "preserve redevelopment agency assets and revenues for use by 'local governments to fund core governmental services' such as fire protection . . . ." (*Matosantos, supra,* 53 Cal.4th at p. 250.) But this perceived intent of the Dissolution Law is vague when applied to section 34171(d)(2), and the language of the provision does not support an interpretation that the Legislature intended to make agreements between former redevelopment agencies and their creators enforceable obligations if to

13

do so would fund core governmental services. That intent simply is not to be found in the provision.

As we noted recently in another case involving the dissolution of redevelopment agencies, the specific language of a statute must prevail over a general, overarching policy a party may perceive in the legislation. " '[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice – and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law. Where, as here, "the language of a provision . . . is sufficiently clear in its context and not at odds with the legislative history, . . . '[we should not] examine the additional considerations of "policy" . . . that may have influenced the lawmakers in their formulation of the statute.' " ' (*Rodriguez v. United States* (1987) 480 U.S. 522, 525–526 [94 L.Ed.2d 533, 538]; accord, *Foster v. Workers' Comp. Appeals Bd.* (2008) 161 Cal.App.4th 1505, 1510 [purpose of law cannot supplant legislative intent expressed in particular statute].)" (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 48, italics omitted.)

In attempting to defend its proposed interpretation of the provision, the County provides no authority or valid reasoning supporting its premise that section 34171(d)(2) does not apply if there are third party beneficiaries to the agreement between a former redevelopment agency and its creator. Therefore, under the language of the provision, an agreement between a former redevelopment agency and its creator is not an enforceable obligation simply because ratepayers may have benefited from the performance of the agreement.

In any event, even if the Legislature intended to make agreements between a former redevelopment agency and its creator enforceable obligations under some circumstances in which another party is involved, there is no evidence of legislative

14

intent to include agreements such as the one here by which ratepayers were to receive some incidental benefit.

The County claims that the Cedar Glen ratepayers were third party beneficiaries of the County Loan. We need not consider contract law with respect to third party beneficiaries, however, because this is a question of statutory interpretation, not a question of contract interpretation. We must determine whether the Legislature intended to make an exception to section 34171(d)(2) for an agreement between a former redevelopment agency and its creator if that agreement bestowed a benefit on ratepayers.

Virtually every public works project of a redevelopment agency benefitted someone or some entity other than the redevelopment agency and its creator. Sewers benefit the property owners and residents along their line; roads bestow a similar benefit, in addition to assisting travelers. The process of improving blighted areas, which was the aim of redevelopment (*County of Los Angeles v. Glendora Redevelopment Project* (2010) 185 Cal.App.4th 817, 823-824), naturally entails benefits to ratepayers, property owners, business owners, and others.

In the case of the County Loan, ratepayers in Cedar Glen would have received a benefit. As the County notes, the agreement between the County and the former redevelopment agency provided: "The County hereby agrees to advance to [the former redevelopment agency] a County Loan for the purpose of undertaking various road and water improvements, providing financial assistance to residential households; providing financial assistance to commercial operation in the [redevelopment project], and purchasing land within the Project Area." But the agreement did not identify anyone or any entity by name.

The ratepayers were not parties to the County Loan; they would have benefited only incidentally from the performance of the agreement.

The question of statutory interpretation is whether the Legislature intended to make an exception in section 34171(d)(2) for agreements such as the County Loan

15

because, in this case, ratepayers stood to benefit from performance of the agreement. We think not, because such an exception would effectively swallow the rule. There is no such express exception, and, under these circumstances, we cannot conclude that the Legislature meant to include one by implication.

We therefore conclude that, under section 34171(d)(2), the County Loan was not an enforceable obligation of the former redevelopment agency.

III

*Unjust Enrichment Argument*

Finally, the County contends that application of section 34171(d)(2) to the County Loan just is not fair. It argues that "equity demands that the unspent County Loan funds be returned to the County. They should not be distributed as a windfall to the taxing entities that never had a legitimate claim to the money." That argument, however, is properly addressed to the Legislature, not to the courts.

Before we consider this argument, we note that the County does not take into consideration the entire statutory picture. As discussed above, the Department of Finance has now issued a finding of completion. Based on that finding, the County can petition the oversight board for a finding that the County Loan should be enforced because it was for legitimate redevelopment purposes. (See § 34191.4, subd. (b)(1).) This is evidence that the Legislature has thought through this process and provided the remedy it deemed appropriate.

The County claims that application of section 34171(d)(2) results in unjust enrichment of local taxing entities (because they will receive a distribution of the funds) and the state (because the state's liability for school funding will be reduced (see *Matosantos, supra,* 53 Cal.4th at p. 248)). Based on this claim of unjust enrichment, the County asserts a right to restitution.

Not surprisingly, the County offers no authority for the proposition that the courts can veto the Legislature's taxing and fiscal policy decisions based on the equitable

16

doctrine of unjust enrichment.  It simply is beyond our purview.  (*Rio Linda Union School Dist. v. Workers' Comp. Appeals Bd.* (2005) 131 Cal.App.4th 517, 532.)

DISPOSITION

The judgment is affirmed.  The Department of Finance is awarded costs on appeal. (Cal. Rules of Court, rule 8.278.)

                                                    NICHOLSON     , J.

We concur:

       BLEASE         , Acting P. J.

       HOCH          , J.