Filed 5/2/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION et al., | B309892 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 19STCP03103) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent; | |
| 6400 SUNSET, LLC, | |
| Real Party in Interest and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge. Affirmed.

Chatten-Brown, Carstens & Minteer, Douglas P. Carstens, Michelle Black and Sunjana Supekar for Plaintiffs and Appellants AIDS Healthcare Foundation and Coalition to Preserve LA.

Best Best & Krieger, Christi Hogin and Patrick T. Donegan; Los Angles City Attorney, Steven N. Blau, Kathryn Phelan and Jennifer Tobkin for Defendant and Respondent City of Los Angeles.

Glaser Weil Fink Howard Avchen & Shapiro, Patricia L. Glaser, Joel N. Klevens and Alexander J. Suarez for Real Party in Interest and Respondent 6400 Sunset, LLC.

In 1986, the former Community Redevelopment Agency of the City of Los Angeles (CRA-LA) established the Hollywood Redevelopment Plan in accordance with the Community Redevelopment Law. (Health & Saf. Code,[1] § 33000 et seq.) The Community Redevelopment Law includes certain housing affordability provisions, including what the parties refer to as the 15 percent requirement. Under this provision, "[p]rior to the time limit on the effectiveness of the redevelopment plan . . . at least 15 percent of all new and substantially rehabilitated dwelling units developed within a project area under the jurisdiction of an agency by public or private entities or persons other than the agency shall be available at affordable housing cost to, and occupied by, persons and families of low or moderate income." (§ 33413, subd. (b)(2)(A)(i).) This requirement applies "in the aggregate," "not to each individual case of rehabilitation, development, or construction of dwelling units." (*Id.*, subd. (b)(3).)

In 2011, the Legislature enacted what is known as the Dissolution Law (§§ 34170−34191.6), which dissolved redevelopment agencies (§ 34172, subd. (a)(1)) and rendered inoperative any provisions of the Community Redevelopment Law that depended upon the "tax increment" method of financing redevelopment agency activities (§ 34189, subd. (a)).

AIDS Healthcare Foundation and Coalition to Preserve LA (CPLA) (collectively, appellants) filed a petition for writ of mandate in the superior court challenging the approval by the City of Los Angeles (the City) of a real estate development project (the project) proposed in an area covered by the Hollywood Redevelopment Plan. Appellants argued that the City's approval

_____

[1] Subsequent unspecified statutory references are to the Health and Safety Code.

2

of the project violated the 15 percent requirement because it did not commit 15 percent of the residential units for affordable housing. The court denied the petition and entered judgment for the City and the real party in interest, 6400 Sunset, LLC (the real party).

We agree with the City and the real party that the Dissolution Law rendered the 15 percent requirement inoperative and, even if it had remained operative, it does not apply to the real party's "individual case of . . . development." (§ 33413, subd. (b)(3).) We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

The real party proposed to construct a 26-story mixed-use building on 0.89 acres within the area covered by the Hollywood Redevelopment Plan. The project would provide up to 200 dwelling units and approximately 7,000 square feet of commercial space on the ground floor. Five percent of the dwelling units would be reserved for "very low income households," as defined in state regulations. (See Cal. Code Regs., tit. 25, § 6926, subd. (a).)

In January 2019, the City's Advisory Agency approved a tentative tract map for the project. CPLA appealed that decision to the City Planning Commission, and argued that the Community Redevelopment Law and the Hollywood Redevelopment Plan required that the real party make 15 percent of the dwelling units available for very low income households. The City Planning Commission denied the appeal in March 2019. CPLA appealed the City Planning Commission's decision to the City Council's Planning and Land Use Management Committee, which denied the appeal in June 2019.

In July 2019, appellants filed a petition for writ of mandate in the superior court seeking, among other relief, a writ commanding the City to set aside and vacate its approval of the project. As is

3

relevant here, appellants alleged that the project failed to comply with the 15 percent requirement. The court denied the petition on the grounds that the pertinent provisions of the Community Redevelopment Law had been "repealed and the redevelopment agencies themselves dissolved in 2012"; and, even under the Community Redevelopment Law, the 15 percent requirement "need not be imposed on each individual project." The court thereafter entered judgment for the City and the real party.

## DISCUSSION

### A. *The Community Redevelopment Law and the 15 Percent Requirement*

Under the Community Redevelopment Law, prior to the enactment of the Dissolution Law, local governments were permitted to establish redevelopment agencies "to 'prepare and carry out plans for the improvement, rehabilitation, and redevelopment of blighted areas.' (§ 33131, subd. (a).)" (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 246 (*Matosantos*).) The former redevelopment agencies did not have the power to tax; instead, they financed their activities through "tax increment financing." (*Ibid.*; see Cal. Const., art. XVI, § 16; § 33670, subds. (a) & (b).) Under tax increment financing, public entities that were entitled to receive property tax revenue derived from property within a redevelopment project area, such as cities and school districts, received property tax revenue based on the assessed value of the property prior to the effective date of the redevelopment plan. The tax revenue received in excess of that amount was a "tax increment" (*Matosantos, supra*, 53 Cal.4th at p. 246) "awarded to the [former] redevelopment agency on the theory that the increase [was] the result of redevelopment" (*id.* at p. 247).

4

The Community Redevelopment Law specifies the powers that former redevelopment agencies had. They include, generally, the power to: borrow money and issue bonds (§§ 33601, 33640, 33761); execute contracts, deeds of trusts, and other instruments (§§ 33125, subd. (c), 33601); purchase, lease, or otherwise acquire (including by eminent domain) interests in property (§§ 33391, 33334.2, subd. (e)(1) & (6)); construct buildings and improve real property with onsite or offsite improvements (§§ 33334.2, subd. (e)(2) & (5), 33421); provide financing for residential and commercial construction (§§ 33743, 33760, subd. (a), 33791, subd. (a)); clear or move improvements from real property (§ 33420); rent, manage, operate, and repair property (§ 33400, subd. (b)), provide subsidies to families of low or moderate incomes (§ 33334.2, subd. (e)(8)), and sell, lease, donate, or otherwise dispose of property (§§ 33430, 33334.2, subd. (e)(3)). (See *Matosantos*, *supra*, 53 Cal.4th at p. 246.)

The Community Redevelopment Law provides for certain housing affordability requirements, including the 15 percent requirement. (§ 33413, subds. (a) & (b).) As noted above, this requirement provides: "Prior to the time limit on the effectiveness of the redevelopment plan . . . at least 15 percent of all new and substantially rehabilitated dwelling units developed within a project area under the jurisdiction of an agency by public or private entities or persons other than the agency shall be available at affordable housing cost to, and occupied by, persons and families of low or moderate income." (*Id.*, subd. (b)(2)(A)(i).)[2]

[2] The time limit for the effectiveness of redevelopment plans that were adopted prior to 1994 "shall not exceed 40 years from the adoption of the redevelopment plan or January 1, 2009, whichever is later." (§ 33333.6, subd. (a).) The Hollywood Redevelopment Plan was adopted in 1986.

Former redevelopment agencies could fulfill the 15 percent requirement by: (1) causing "to be available . . . two units outside a project area for each unit that otherwise would have been required to be available inside a project area" (§ 33413, subd. (b)(2)(A)(ii)); (2) aggregating "new or substantially rehabilitated dwelling units in one or more project areas, if the agency finds, based on substantial evidence, after a public hearing, that the aggregation will not cause or exacerbate racial, ethnic, or economic segregation" (*id.*, subd. (b)(2)(A)(v)); and (3) purchasing or otherwise acquiring "long-term affordability covenants on multifamily units that restrict the cost of renting or purchasing those units" (*id.*, subd. (b)(2)(B)).

## B. *The Hollywood Redevelopment Plan*

In May 1986, the CRA-LA established the Hollywood Redevelopment Plan to pursue redevelopment in the Hollywood area that "will attain the purposes of the California Community Redevelopment Law." (See *Blue v. City of Los Angeles* (2006) 137 Cal.App.4th 1131, 1134.) Among the goals of the plan are to "increase the supply and improve the quality of housing for all income and age groups, especially for persons with low and moderate incomes."

The Hollywood Redevelopment Plan includes a provision that mirrors the 15 percent requirement[3] and includes the proviso that the requirement "shall apply in the aggregate to housing in the [Hollywood Redevelopment] Project Area and not to each individual

---

[3] The pertinent provision in the Hollywood Redevelopment Plan states: "At least fifteen percent (15%) of all new or rehabilitated units developed within the [p]roject [a]rea by public or private entities or persons . . . shall be for persons and families of low or moderate income."

6

case of rehabilitation, development or construction of dwelling units."

## C. *The Dissolution Law*

The system of tax increment financing for redevelopment agencies became "a source of contention because of the financial advantage it provide[d] redevelopment agencies and their community sponsors, primarily cities, over school districts and other local taxing agencies," and its effect "on school districts' property tax revenues . . . [became] a point of fiscal conflict between California's community redevelopment agencies and the state itself." (*Matosantos*, *supra*, 53 Cal.4th at p. 248.) By 2011, the "diversion" of "property tax revenue to redevelopment agencies each year . . . made it increasingly difficult for the state to meet its funding obligations to the schools." (Stats. 2011, 1st Ex. Sess. 2011−2012, ch. 6, § 1(b), p. 5865.) The Legislature therefore enacted the Dissolution Law. (See, e.g., *Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 208 (*Cuenca*); *County of San Bernardino v. Cohen* (2015) 242 Cal.App.4th 803, 815; see Stats. 2011, 1st Ex. Sess. 2011−2012, ch. 5, § 7, pp. 5848−5862 [enacting part 1.85 of the Health and Safety Code].)

The Dissolution Law "eliminated the tax increment" (*Cuenca*, *supra*, 8 Cal.App.5th at p. 211) and declared "inoperative" "all provisions of the Community Redevelopment Law that depend on the allocation of tax increment to redevelopment agencies" (§ 34189, subd. (a); see *Covarrubias v. Cohen* (2016) 3 Cal.App.5th 1229, 1237 [under section 34189, "*any* provision depending on allocation of tax increment is inoperative"]).

The Dissolution Law also dissolves all redevelopment agencies (§ 34172, subd. (a)(1)), generally bars the creation of new redevelopment agencies (*id.*, subd. (a)(2)), and withdraws the

7

authority of former redevelopment agencies "to transact business or exercise powers previously granted under the Community Redevelopment Law" (*id.*, subd. (b)).

The Dissolution Law provides for the creation of "successor agencies" to the former redevelopment agencies (§ 34173, subd. (a)) and "housing successor[s]" (§ 34176, subd. (a)(3)), which acquired the former redevelopment agency's "housing functions and assets" (§ 34177, subd. (g)).  The successor agencies, however, have no "legal authority to participate in redevelopment activities, except to complete any work related to an approved enforceable obligation." (§ 34173, subd. (g).)

The Dissolution Law places tax increment funds previously allocated to former redevelopment agencies in a trust fund administered by the county auditor-controller to pay the principal and interest on loans and other indebtedness incurred by the former agencies.  (§§ 34170.5, subd. (b), 34172, subd. (c).)  Any "unencumbered balances of redevelopment agency funds" are required to be distributed "to the taxing entities," such as cities, counties, and school districts.  (§ 34177, subd. (d).)

Prospectively, revenue from property taxes that would have been allocated to redevelopment agencies under the Community Redevelopment Law are, under the Dissolution Law, used to make payments on the former redevelopment agency's debts and other obligations, and to pay for certain administrative costs.  (§§ 34172, subd. (d), 34183, subd. (a)(1)−(3).)  Any excess amounts are distributed to taxing entities.  (§§ 34172, subd. (d), 34183, subd. (a)(4); see *City of Chula Vista v. Drager* (2020) 49 Cal.App.5th 539, 560−563.)

8

**D.    *Analysis***

The City and the real party contend that the Dissolution Law renders the 15 percent requirement inoperative because complying with that requirement depends upon the allocation of tax increment to redevelopment agencies.  We agree.

Under the Dissolution Law, "all provisions of the Community Redevelopment Law that depend on the allocation of tax increment to redevelopment agencies . . . shall be inoperative." (§ 34189, subd. (a).)  Determining whether the 15 percent requirement depends upon the allocation of tax increment requires the interpretation of the Community Redevelopment Law and the Dissolution Law.  We review these issues de novo.  (See *City of Petaluma v. Cohen* (2015) 238 Cal.App.4th 1430, 1438−1439; *County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 47.)

In interpretating statutes "we must interpret [particular provisions] in context with the entire statute and the statutory scheme." (*In re Jennings* (2004) 34 Cal.4th 254, 263.)  Here, the 15 percent requirement is among the affordable housing obligations within the Community Redevelopment Law and must be viewed in the context of that law.  (Cf. *City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 585 [particular provisions of the Dissolution Law "must be harmonized with the rest of the dissolution statutes, if possible"].)

The Community Redevelopment Law provided former redevelopment agencies with various statutory tools to satisfy the 15 percent requirement and the financial means—specifically, the allocation to the former agencies of tax increment—necessary to implement these tools.  Agencies could, for example, fulfill the 15 percent requirement by purchasing apartment buildings and leasing units to low and moderate income families (§§ 33391, 33334.2, subd. (e)(1), 33430), constructing or rehabilitating low and

9

moderate income housing units (§ 33334.2, subd. (e)(5) & (7)), providing subsidies to low and moderate income families for housing (*id.*, subd. (e)(8)), purchasing and donating land to organizations that would build affordable housing (*id.*, subd. (e)(1) & (3)), or purchasing long-term affordability covenants on multifamily units (§ 33413, subd. (b)(2)(B)). These and other tools available to former redevelopment agencies to meet the affordable housing obligations required money. Redevelopment agencies, however, could not levy taxes to pay for these tools; the agencies were dependent upon the funds supplied by the tax increment.[4] (*Matosantos*, *supra*, 53 Cal.4th at p. 246.) Appellants do not identify any another source of funds in their appellate briefs.

During oral argument, counsel for appellants asserted for the first time that former redevelopment agencies could raise funds to finance the costs of fulfilling the 15 percent requirement by issuing bonds. (See § 33640.) Bonds, however, have to be repaid, and the former agencies repaid the bonds, generally, from the same source of funds used to pay other obligations—from the tax increment. (See *Matosantos*, *supra*, 53 Cal.4th at p. 247; § 33670, subd. (b) [tax increment funds are "paid into a special fund of

---

[4] Although former redevelopment agencies could receive funds derived from their redevelopment activities, such as rent payments from tenants and proceeds from the sale of property, such post-Dissolution Law sources of revenue reflect "significantly reduced resources and income that may be sporadic and somewhat unpredictable." (Assem. Com. on Appropriations, Analysis of Sen. Bill. No. 341 (2013−2014 Reg. Sess.) as amended May 30, 2013, pp. 1−2.) Former redevelopment agencies could not reasonably depend upon such insignificant and undependable sources of revenue to meet the 15 percent requirement; the availability of tax increment funds was therefore essential to implementing the 15 percent requirement.

10

the redevelopment agency to pay the principal of and interest on loans, moneys advanced to, or indebtedness . . . incurred by the redevelopment agency to finance or refinance, in whole or in part, the redevelopment project"]; *Community Redevelopment Agency v. Bloodgood* (1986) 182 Cal.App.3d 342, 344 [a former redevelopment agency's "major source of funds to repay its debts" is the tax increment].)  The issuance of bonds, therefore, was an integral part of tax increment financing and dependent upon it, not an alternative to it.

Thus, the only means available to the former redevelopment agencies for fulfilling the 15 percent requirement were the tools specified in the Community Redevelopment Law, which were funded primarily with tax increment.  Complying with the 15 percent requirement was therefore dependent upon the funds supplied by tax increment.  Because the Dissolution Law rendered all provisions that depended upon tax increment inoperative, the Dissolution Law rendered the 15 percent requirement inoperative.

Appellants do not refer us to any provision in the Dissolution Law that reasonably suggests that the Legislature intended the 15 percent requirement to survive after it dissolved redevelopment agencies and eliminated tax increment financing.  Indeed, rather than directing successor agencies to fulfill the former redevelopment agencies' affordable housing requirements, which, under the Community Redevelopment Law, could have occurred over several decades (§ 33333.6, subd. (a)), the Legislature directed successor agencies to "[e]xpeditiously wind down the affairs of the redevelopment agency" (§ 34177, subd. (h)), generally barred them from "participat[ing] in redevelopment activities" (§ 34173, subd. (g)), and required them to remit to the county auditor-controller for distribution to the taxing entities the "unencumbered balances of redevelopment agency funds" that might otherwise have

11

been available to fulfill the affordable housing requirements (§ 34177, subd. (d).) Housing successors have access, generally, only to the funds derived from housing assets[5] and must spend them fulfilling specific tasks, which do not include complying with the 15 percent requirement. (§ 34176.1, subd. (a)(1)−(3).)

Appellants note that, under the Dissolution Law, successor agencies must perform the former redevelopment agencies' "enforceable obligations" (§ 34177, subds. (a) & (c)), and contend that the 15 percent requirement is such an obligation. We disagree.

Although the statutory definition of "enforceable obligations" (§ 34171, subd. (d)(1)(C)) includes "obligations imposed by state law" (§ 34167, subd. (d)(3)), the Dissolution Law consistently refers to enforceable obligations in terms of monetary and existing contractual obligations, and does not contemplate that the phrase includes the statutory housing affordability requirements. Under section 34169, for example, after the enactment of the Dissolution Law, but before the creation of successor agencies, redevelopment agencies were required to "adopt an Enforceable Obligation Payment Schedule [(EOPS)] that lists all of the obligations that are enforceable" (§ 34169, subd. (g)(1)), and which identifies the

---

[5] Housing assets include: interests in real property and restrictions on the use of real property that were acquired for low and moderate income housing purposes; funds encumbered by an enforceable obligation to build or acquire low and moderate income housing; loans or grants funded from the Low and Moderate Income Housing Fund; funds derived from rents or operation of property acquired for low and moderate income housing purposes; rents or other payment from tenants or operates of low and moderate income housing; and repayments of loans owed to the Low and Moderate Income Housing Fund. (§ 34176, subd. (e)(1)−(6).)

"payee" and the "amount of payments obligated to be made" (*id.*, subd. (g)(1)(B) & (D)).

After the successor agency is created, the successor agency must use the redevelopment agency's last EOPS to prepare a Recognized Obligation Payment Schedule (ROPS).  (§ 34177, subd. (a)(1).)  The ROPS must identify "the enforceable obligations of the former redevelopment agency" (*id.*, subd. (*l*)(1)(A)) and "project the dates and amounts of scheduled payments for each enforceable obligation for the remainder of the time period during which the redevelopment agency would have been authorized to obligate property tax increment had the redevelopment agency not been dissolved."  (*Id.*, subd. (*l*)(2)(A).)  The Department of Finance shall thereafter make a "determination of the enforceable obligations and the amounts and funding sources of the enforceable obligations."  (*Id.*, subds. (m)(1) & (*o*)(1).)

The successor agency may also submit a "Last and Final" ROPS, which "shall list the remaining enforceable obligations of the successor agency in the following order:  [¶] (A) Enforceable obligations to be funded from the Redevelopment Property Tax Trust Fund[; ¶] (B) Enforceable obligations to be funded from bond proceeds or enforceable obligations required to be funded from other legally or contractually dedicated or restricted funding sources[; and ¶] (C) Loans or deferrals authorized for repayment" pursuant to specified statutes.  (§ 34191.6, subd. (b)(1).)

The references in these provisions to the "payee" (§ 34169, subd. (g)(1)(B)), the "amount of payments obligated" (*id.*, subd. (g)(1)(D)), the "amounts of scheduled payments" (§ 34177, subd. (*l*)(2)(A)), the "amounts . . . of the enforceable obligations" (*id.*, subds. (m)(1) & (*o*)(1)), and the particular sources of funds to satisfy the enforceable obligations strongly supports that enforceable obligations of a former redevelopment agency are obligations that

13

can be fulfilled by the payment of money obtained from specified sources, not by attaining a certain percentage of affordable housing units.  This interpretation is strengthened by other provisions of the Dissolution Law, which consistently refer to enforceable obligations in terms of monetary and existing contractual obligations.  (See § 34171, subd. (d)(1)(C) [enforceable obligations include "legally enforceable payments required in connection with the agencies' employees, including, but not limited to, pension payments, pension obligation debt service, unemployment payments, or other obligations conferred through a collective bargaining agreement"]; § 34172, subd. (a)(2) [community may create new agency if "the successor entity has paid off all of the former agency's enforceable obligations"]; § 34173, subd. (h)(1) [a city may loan funds to successor agency "to pay approved enforceable obligations"]; § 34174, subd. (a) [Dissolution Law shall not be construed as causing "an event of default under any of the documents governing the enforceable obligations"]; § 34177, subd. (a) [successor agencies shall "[c]ontinue to make payments due for enforceable obligations"]; § 34177.3, subd. (b) ["successor agencies may create enforceable obligations to conduct the work of winding down the redevelopment agency, including hiring staff, acquiring necessary professional administrative services and legal counsel, and procuring insurance"]; § 34179.5, subd. (b)(2) [enforceable obligations including "contracts detailing specific work to be performed" and "indebtedness obligations"]; *id*., subd. (c)(5)(D) [successor agency's list of all approved enforceable obligations shall include "a projection of annual spending requirements to satisfy each obligation"]; § 34182, subd. (c)(2) [county auditor-controller shall administer the redevelopment property tax trust fund "for the benefit of the holders of former redevelopment agency enforceable obligations and the taxing entities"]); § 34187, subds. (b) & (h)

14

[successor agency may be dissolved when all of "the enforceable obligations have been retired or paid off"]; § 34191.4, subd. (c)(1)(A) ["[e]nforceable obligations may be satisfied by the creation of reserves for projects that are the subject of the enforceable obligation and that are consistent with the contractual obligations for those projects"]; see also *Cuenca, supra,* 8 Cal.App.5th at p. 225 [although former redevelopment agency had previously set aside funds to be used for low and moderate income housing pursuant to stipulated judgments, the use of such funds for that purpose after the Dissolution Law was not an enforceable obligation because the judgments "d[id] not constitute contracts to construct any housing"].)

The appellants contend that the City, as the former CRA-LA's housing successor, is not limited to the statutory powers previously available to former redevelopment agencies under the Community Redevelopment Law. The 15 percent requirement, they argue, could be met by the exercise of the City's "inherent police power, separate from funding mechanisms." Instead of using tax increment financing to purchase, construct, or subsidize affordable housing units, for example, the City could take advantage of its police powers to impose upon developers, such as the real party in this case, a requirement that the development project includes a certain percentage of affordable housing units. They point to inclusionary housing ordinances adopted by some municipalities to require or encourage real estate developers to provide housing units affordable to low and moderate income families. (See, e.g., *California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 457 [upholding San Jose's inclusionary housing ordinance as a permissible police power regulation].) We reject this argument.

Even if we assume arguendo that the City is the former CRA-LA's housing successor[6], the Dissolution Law did not grant to the housing successor any powers the former redevelopment agency did not have (§ 34176, subd. (a)(1)), and former redevelopment agencies did not have general police powers. A local government's police powers are derived from article XI, section 7 of our state Constitution, which provides that "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7; see *City and County of San Francisco v. Regents of University of California* (2019) 7 Cal.5th 536, 544; *Department of Finance v. Commission on State Mandates* (2021) 59 Cal.App.5th 546, 561–562.) This authority is granted to counties and cities, not former redevelopment agencies, which derived their existence and authority from the Community Redevelopment Law. (§§ 33100, 33122; see *Matosantos*, *supra*, 53 Cal.4th at p. 256 ["[r]edevelopment agencies are . . . creatures of the Legislature's exercise of its statutory power"]; 8 Miller & Starr, Cal. Real Estate (4th ed. 2021) § 30:4 [scope of former redevelopment agencies' authority was "defined and limited by the Community Redevelopment Law"].) Nothing in that law authorized former redevelopment agencies to invoke the police powers constitutionally granted to counties and cities. Because general police powers were not available to redevelopment agencies under the Community Redevelopment Law and the Dissolution Law granted housing successors no greater powers, the City could not, as a housing

---

[6] It is not clear from our record or the parties' arguments whether the City is the CRA-LA's housing successor. (See § 34176.) We do not need to decide, and do not decide, this issue.

successor, invoke such powers to require a developer to comply with the 15 percent requirement.

Appellants attempt to avoid the conclusion that the former redevelopment agencies lacked authority to invoke general police powers by pointing out that it is now the City—a governmental entity that can invoke the police power—that has the burden of complying with the 15 percent requirement.  The argument, however, erroneously assumes that the 15 percent requirement remained operative after the Dissolution Law went into effect and that the City is bound by it.

The "provisions of the Community Redevelopment Law that depend on the allocation of tax increment to redevelopment agencies" became "inoperative" "on the effective date of [the Dissolution Law]."  (§ 34189, subd. (a).)  Up until that time, the 15 percent requirement applied to redevelopment agencies, not cities or counties, and was thus dependent upon tax increment financing.  The requirement was therefore rendered inoperative by the Dissolution Law when it went into effect (*ibid.*), and nothing in the Dissolution Law suggests that municipalities would thereafter be bound by the 15 percent requirement.  (See *Macy v. City of Fontana* (2016) 244 Cal.App.4th 1421, 1432 [nothing in the Dissolution Law "imposes on municipalities any liability with respect to a dissolved [redevelopment agency's] pre-existing low- and moderate-income housing obligations"].)

Appellants further argue that, even if the 15 percent requirement in the Community Redevelopment Law is inoperative, the Hollywood Redevelopment Plan includes a similar 15 percent requirement, which, they contend, " 'appear[s] to remain in full force and effect.' "  We disagree.  The Hollywood Redevelopment Plan expressly "provides the Agency"—defined as the CRA-LA, not the City—"with powers, duties and obligations" set forth in the

17

plan. The CRA-LA, however, was dissolved by the Dissolution Law, and nothing in the Hollywood Redevelopment Plan imposed any affordable housing obligations on the City.

Appellants also rely on what they consider "[t]he straightforward language of the [Community Redevelopment Law]," which "says that 15 [percent] of the residential units created in a redevelopment area . . . by an entity other than the redevelopment agency must be affordable." "A plain reading of the statute," they contend, "dictates that the [real party] can be required to provide 15 [percent] of its units as affordable housing in order for the City to comply with the requirements of the [Community Redevelopment Law]." This argument not only erroneously assumes that the 15 percent requirement survived the Dissolution Law, but also ignores the statutory provision that the 15 percent requirement "shall apply, in the aggregate, to housing in [a redevelopment project area] and *not to each individual case of rehabilitation, development, or construction of dwelling units*, unless an agency determines otherwise." (§ 33413, subd. (b)(3), italics added.) The CRA-LA never determined otherwise. Under the straightforward language of this provision, even if the 15 percent requirement remained operative, the real party is not required to fulfill the terms of that requirement with respect to its "individual case of . . . development."

Appellants make a similar argument based upon the substantially identical 15 percent requirement in the Hollywood Redevelopment Plan. The Hollywood Redevelopment Plan, however, included the same proviso as the Community Development Law: The 15 percent requirement "shall apply in the aggregate to housing in the [Hollywood Redevelopment] Project Area and not to each individual case of rehabilitation, development or construction of dwelling units." Therefore, even if the Hollywood

18

Redevelopment Plan had survived the Dissolution Law and the City is obligated under the plan, the requirement does not apply to the real party's "individual case" of development.

**DISPOSITION**

The judgment is affirmed. The City of Los Angeles and 6400 Sunset, LLC, are awarded their costs on appeal.

<u>CERTIFIED FOR PUBLICATION</u>.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

CRANDALL, J. *

---

**\*** Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19